In re MONEX CORPORATION, Debtor.

### Harold D. MOOREFIELD, Jr., as Trustee, Plaintiff,

v.

### Milton PERLMAN, Defendant.

**Bankruptcy No. 82–01184–BKC–JAG.**
**Adv. No. 83–0616–BKC–JAG–A.**

United States Bankruptcy Court,
S.D. Florida.

Oct. 11, 1984.

---

Steel, Hector & Davis, Miami, Fla., for Milton Perlman.

Webster & Moorefield, Miami, Fla., for trustee.

## FINDINGS AND CONCLUSIONS

JOSEPH A. GASSEN, Bankruptcy Judge.

This is an adversary proceeding brought by the trustee for the debtor, Monex Corporation, against the debtor's principal, Milton Perlman, to recover a debt arising from advances by the corporation to Perlman (Count I) and to impose a constructive trust upon real property owned by Perlman, on which Monex Corporation operated its manufacturing business, arising from the termination of a joint venture between the corporation and Perlman (Count II). The defendant, Perlman raises affirmative defenses (to Count I) that the indebtedness owed by Perlman to the debtor was discharged by novation and that the trustee lacks standing to bring this action. The defendant further asserts that the amounts claimed by the trustee (Counts I and II) are subject to setoffs arising from guaranties given by Perlman to various creditors of the debtor.

The trial was held on February 21, 1984. In making the following findings and conclusions, the Court has considered the testimony at trial of the defendant, Milton Perlman; of James C. Spector, Senior Vice

President of Walter E. Heller & Company Southeast, Inc.; and of Leroy Koross and Malcolm Neuwahl, expert witnesses for the plaintiff and defendant, respectively. The parties stipulated to many of the facts, and other evidence was admitted in the form of documentary exhibits.

On July 1, 1980, Monex Corporation and Milton Perlman, who served as its president, majority stockholder and one of its directors, entered into an Agreement of Joint Venture (Plaintiff's Exhibit 29) whereby the parties formed a joint venture to be known as the "Monex Company". The purpose of the Joint Venture was, *inter alia*, to assist Monex Corporation's business as a whole by providing it with a positive net worth, which would enable the joint venture to acquire financing on better terms than Monex Corporation's then existing financing arrangement. Pursuant to the terms of the agreement, Monex Corporation contributed to the joint venture all of its assets and liabilities, which on July 1, 1980, had a negative balance, i.e., liabilities exceeded assets. Under paragraph 4(a) of the agreement, the corporation's capital deficiency was reduced to zero so that as a result, the corporation's beginning capital account in the joint venture was zero. Milton Perlman contributed to the joint venture the land and building upon which Monex Corporation operated its manufacturing business, which pursuant to paragraph 4(b) of the agreement had a fair market value (net of the mortgage) of $1,900,000.00. However, Mr. Perlman's capital account in the joint venture was initially established in the amount of $1,850,176.00. (Plaintiff's Exhibit 31, Defendant's Composite Exhibit B).

On November 30, 1981, Monex Corporation and Milton Perlman executed an agreement entitled "Termination of Joint Venture" (Plaintiff's Exhibit 4), wherein the parties mutually agreed to terminate the joint venture effective December 1, 1981. The parties terminated the joint venture because financing was no longer available at a more favorable rate and thus the joint venture no longer served any useful purpose. As a result of the termination agreement, the joint venture conveyed the land and building back to Milton Perlman, and Perlman assumed the liabilities on such land and building. Monex Corporation received the remaining assets and assumed the other outstanding liabilities of the joint venture.

Prior to the joint venture, Walter E. Heller & Company Southeast, Inc., provided financing to Monex. On February 19, 1982, Monex Corporation borrowed approximately $2,500,000.00 from Heller. This debt was secured by an Accounts Financing Security Agreement, in which Monex Corporation granted Heller a security interest in all of the corporation's accounts receivable, evidences of debt, instruments, chattel paper, general intangibles and contract rights, all proceeds thereof, and after-acquired property of the same type. In addition, Milton Perlman personally guarantied the corporation's debt to Heller and collateralized the guaranty by pledging to Heller mortgages on the Monex business premises owed by Perlman. (Plaintiff's Composite Exhibit 23).

In June 1982, Monex Corporation's debt to Heller was in default. Monex surrendered its collateral to Heller pursuant to a "Voluntary Surrender of Collateral" executed by the parties on June 4, 1982 (Plaintiff's Composite Exhibit 12), while Perlman assumed liability on his guaranty for any shortfall resulting from Heller's disposition of the collateral, pursuant to a "Waiver of Notice of Disposition of Collateral" executed by Perlman on June 2, 1982 (Plaintiff's Composite Exhibit 25).

Heller thereafter sold the equipment and inventory (which Monex had turned over to it) back to Perlman, who commenced doing business as Metal Studs, Inc. Heller is financing Metal Studs as it had previously financed Monex Corporation. Those aspects of Monex's transactions were litigated in *Walter E. Heller & Co. Southeast, Inc. v. Monex Corporation and Harold D. Moorefield, as Trustee*, Adversary Case No. 82–0747–BKC–JAG–A.

These Chapter 7 proceedings were initiated by involuntary petition filed against the debtor on June 22, 1982. An order for relief was entered against Monex Corporation on July 16, 1982.

Up until the commencement of this Chapter 7 case, Monex Corporation had loaned Milton Perlman a total amount of $608,162.00. Also prior to the commencement of these proceedings, Perlman gave other personal guaranties of Monex Corporation's debts, as discussed in detail below.

## Count I

The Court finds primarily for defendant on Count I. It is undisputed that Perlman borrowed from the debtor the sum of $608,162.00, most of which was advanced substantially prior to the filing of the involuntary petition.

Perlman argues that this debt to the corporation has been discharged by what he characterizes as a novation. On July 26, 1979, the board of directors of Monex Corporation, consisting of the defendant and his two sons, passed a resolution which provided, in effect, that Perlman's debt to the corporation need not be paid until Perlman was no longer liable on any guaranties of corporate debt. The resolution states as follows:

... That Mr. Perlman's guarant[ies] [to Heller, Doolan and Ryder are] essential to this corporation and that his additional guaranties may be required in the future in order for the business to function and prosper. That in consideration of furnishing his personal payment guaranties, Mr. Perlman shall be indemnified by Monex Corporation and save harmless from any and all claims, liability, responsibility, damages, losses, costs, judgments or attorney's fees that Mr. Perlman may incur as a result of or arising out of the furnishing of his personal payment guaranty of this corporation's debt.

... That in consideration of supporting his personal guaranty by giving collateral mortgages to both Heller and Ryder, amounts due to the Corporation by Milton Perlman (amounting to $471,650 as at 6/30/79) shall be considered non-current and payable only at such time as his guaranties are no longer required and any mortgages securing his guaranties are satisfied in full without loss or cost to Mr. Perlman.

(Plaintiff's Exhibit 11).

■ There was adequate consideration for this waiver of the immediate right to payment because Perlman gave or renewed guaranties and gave collateral to secure the guaranties subsequent to adoption of the resolution. Thus it would be contractually enforceable.

■ Under the terms of this resolution, $471,650 of Perlman's debt to the corporation would not be presently due to the corporation. There is a substantial corporate debt which has been guarantied by Perlman and will never be paid by the corporation. Although the resolution is phrased in a contingent form, providing that Perlman's debt will not be due and payable as long as he may be liable under the guaranties, the Court concludes that under the terms of the resolution and based on the facts of this case, the debt, to the extent of $471,650, will never be due to the corporation. The terms of the resolution are ambiguous as to whether it was to apply only to the debt then due (stated to be $471,650), or to all indebtedness ever incurred by Perlman to the corporation. The Court finds that only the debt stated in the resolution was intended to be included and concludes as a matter of law that the resolution must be so interpreted.

■ The trustee argues that this resolution is of no effect because it violates the Florida corporate statutes, and in particular, Florida Statutes § 607.144. The Court finds that there has been insufficient proof of any violation of this statute. The harm, if any, which the Court perceives in this transaction, would have resulted to the creditors, and the Court has considered whether it might be creating a fraudulent conveyance to give effect to the terms of this resolution. At first glance it appears that the creditors would be harmed in that they are being deprived of funds that

884

would otherwise be available to them. However, the guaranties enabled the corporation to continue doing business. Both the elements of inadequate consideration and of intent are absent. Perlman, the tranferee, is not receiving an unfair benefit, but is receiving compensation for the detriment he has suffered or is liable for as a result of his providing the benefit of the guaranties to the corporation.

The Court has carefully considered the bona fides of the guaranties and their amounts, and is satisfied that the amount for which Perlman could be liable on valid guaranties surpasses the amount of the Perlman debt to the corporation which is being extinguished. For purposes of the legal determination on this point, it does not matter that Perlman has not yet paid on much of the guarantied debt. He has the liability, and since the major guaranty (to Heller) is secured, the threat of payment of that liability is a very real detriment.

■ Perlman has raised an additional defense to the entire debt, which he characterizes as a standing issue. The Court finds that it is without merit.

Perlman argues that the security agreement between Heller and Monex Corporation (Plaintiff's Composite Exhibit 23) was so broad that it encompassed Perlman's debt to Monex as part of the Heller collateral. Perlman further argues that the amount still owing to Heller from Monex is greater than Perlman's debt to Monex, and that therefore the Perlman debt would go to Heller as collateral and the trustee has no interest in it or standing to try to collect it in this adversary proceeding.

The Court agrees with the trustee that he has a duty to try to collect the assets of the estate, one of which is the Perlman debt, and that the account debtor (Perlman), whose debt is alleged to be collateral of another's debt, may not prevent the trustee from collecting it from him. Heller may have waived its right to claim the Perlman debt as collateral on the Monex debt by entering into the agreement with Monex on June 4, 1982 entitled "Voluntary

Surrender of Collateral" (Plaintiff's Composite Exhibit 12), and accepting only the collateral which was thereafter sold without asserting that it claimed this debt as collateral. However, that issue is not before the Court in this adversary proceeding.

*Count II*

The Court finds for defendant on Count II.

■ The trustee's argument is based solely upon paragraph 5(b) of the Agreement of Joint Venture. That paragraph states:

Based on the financial benefits to be obtained by virtue of the completely disproportionate capital contributions, the allocation of depreciation on machinery, equipment and fixed assets (including the factory premises) together with any investment tax credit, shall be allocated to [Perlman].

(Plaintiff's Exhibit 29). The trustee takes the position that paragraph 5(b) is controlling as to the treatment of the depreciation of fixed assets both for purposes of distributing profits and losses during the life of the joint venture and distributing profits and losses upon termination of the joint venture. Thus the trustee argues that the amount of depreciation deducted by Perlman for tax purposes during the existence of the joint venture must also be deducted from his capital account at the termination of the joint venture. The trustee further argues that paragraph 5(c) of the joint venture agreement, providing for the allocation of 80% of net profits or losses to Monex Corporation and 20% to Perlman, applies to the determination of profits or losses at the termination of the joint venture and that thus Perlman owes Monex 80% of the value of the real property in excess of Perlman's capital account (after deduction of depreciation, as reflected on the Joint Venture's federal income tax return for the period ending November 30, 1981), or $266,172. (Plaintiff's Exhibits 19, 31).

The intent of the parties as to treatment upon termination is not explicitly stated in the joint venture agreement, as Perlman's own expert witness testified. However, the Court finds against the trustee, based on its review and interpretation of the documents.

Paragraph 5 of the joint venture agreement contains provisions which specify the treatment of certain items of the joint venture for tax purposes. Paragraph 5(b) of the agreement allocates depreciation on all of the fixed assets, together with any investment tax credit, to Milton Perlman. These are clearly items specifically relating to taxes. The parties agreed that the tax benefits of the depreciation would accrue to Mr. Perlman in consideration of the "completely disproportionate capital contributions" in view of his contribution of the land and building. Paragraph 5(c) allocates the net profits and losses to the joint venture (which are defined in paragraph 5(d) as the net taxable income or loss as reported on the annual federal income tax return of the joint venture) between Monex Corporation and Milton Perlman. Thus, paragraph 5 of the agreement appears to govern allocations only for tax purposes during the existence of the joint venture and not for other purposes. (Plaintiff's Exhibit 29).

On the other hand, paragraph 6 of the agreement, entitled "Additions and Disposals", states the allocation rules to be applied for financial purposes. Paragraph 6 of the Agreement provides that any adjustments to the land and building shall be for the account of Milton Perlman, while any adjustments to the machinery, equipment or leasehold improvements shall be for the account of Monex Corporation. (Plaintiff's Exhibit 29).

This Court finds that according to the agreements between the parties, the depreciation of the machinery, equipment, and other fixed assets (excluding the building) should be charged to the capital account of Monex Corporation for financial purposes upon termination of the joint venture. On the other hand, the depreciation on the building contributed by Milton Perlman should be charged to his capital account for financial purposes upon termination of the joint venture. These allocations in the Joint Venture Agreement are fully consistent with the language of paragraph 2 of the termination agreement providing that the parties shall return whatever they received from each other by virtue of the joint venture agreement. (Plaintiff's Exhibit 4). Based on this analysis, the Court finds that the ending joint venture capital account at November 30, 1981 for Monex Corporation is a negative $163,824.00, and the ending joint venture capital account of Milton Perlman is a positive $1,783,615.00. A continuation of this financial analysis shows that the distributions upon termination of the joint venture resulted in an excess distribution to Milton Perlman of $54,271.00 and a deficit distribution to Monex Corporation in the same amount. (Defendant's Composite Exhibit B).

The Court concludes that the distribution of the property of the joint venture upon the termination of the joint venture shall be in accordance with the agreement of the parties, as set forth in the joint venture agreement (Plaintiff's Exhibit 29) and termination agreement (Plaintiff's Exhibit 4).

According to the terms of the joint venture agreement and termination agreement, the accounting principles to be applied to the distribution of profits during the existence of the joint venture were separate and distinct from the principles to be applied to distribution upon termination. Therefore, it is not appropriate to apply the depreciation provision of paragraph 5(b) of the joint venture agreement (upon which the trustee relies) to distribution upon termination, since there is evidence of a different intent by the parties. Therefore, this Court finds that the defendant owes $54,271.00 to the debtor under Count II.

*The Setoff Defense*

Perlman argues that he need not pay the trustee any of the amounts he owes to the debtor (under Counts I and II), because he has a right to set off his liability under the

guaranties against his debt to the corporation.

This defense requires an examination of the interaction of several sections of the Bankruptcy Code. Perlman did not file a claim as a creditor, and therefore there is no claim to be allowed under 11 U.S.C. § 502. However, even if he had filed a claim, under 11 U.S.C. § 502(e) there are special provisions which affect the allowance and disallowance of claims based on guaranties. Under that subsection, Perlman's claim could not be allowed if the debt which he guarantied was disallowed as a claim by the primary creditor, if his claim was still contingent at the time of allowance, or if he had requested subrogation under 11 U.S.C. § 509.

Had Perlman filed a claim, but requested subrogation under § 509, it is provided that he would be subrogated to rights of the primary creditor only to the extent of actual payment on the guaranty. The primary creditor would then be paid first, and Perlman would be subordinated until the primary creditor had been paid in full. It appears that it was again the intent of Congress to disallow subrogation in instances where the primary creditor's claim against the debtor was or would be disallowed, although this is not perfectly clear in the language which has been used to make § 509 consistent with § 502.

■ Finally, 11 U.S.C. § 553 provides for setoffs. This section permits a limited preference in favor of certain creditors by allowing them to offset "mutual" debts, with protections for the debtor and other creditors. Under § 553(a)(1) the setoff will not be permitted if the creditor's claim against the estate has been disallowed. Although this is a Chapter 7 case, and no proof of claim was filed by Perlman, the Court will treat this adversary litigation as a determination of the validity of the claim. *Cf., Waldschmidt v. Columbia Gulf Transmission Co. (In re Fulgham Construction Corp.)*, 23 B.R. 147 (Bkrtcy., M.D.Tenn.1982).

■ Considering the statutory sections involved here and the case law, the Court concludes that for each guarantied debt which Perlman seeks to use as a setoff against his debt to the corporation, Perlman must prove that there was a guaranty given by him, a valid, allowable claim of the primary creditor against the corporation, and actual payment by Perlman. The burden of proof on these elements of the defense is on Perlman.

The guarantied debts which Perlman claims to be liable for and which he is claiming as setoffs are debts of Monex Corporation to Walter E. Heller & Company, Southeast, Ryder Truck Rental, Inc., Doolan Steel Corporation, and Foremost Manufacturing Company. Debts to Thyssen, Inc. and Hubbell Steel Corporation and for "legal expenses" are incorporated into the Foremost debt because the basis for that debt is that Foremost guarantied the debts to the other two companies and then paid those debts for the benefit of Monex.

■ The guaranties for Heller, Ryder, and Doolan were put into evidence in Plaintiff's Composite Exhibits 23, 6, and 7, respectively. Perlman's indemnification agreement to Foremost is in evidence in Plaintiff's Composite Exhibit 28. The trustee argued that because Foremost is owned by the defendant's brother, the agreement is invalid, but the Court does not perceive any legal basis for invalidating an agreement simply because of a familial relationship between the principals, and there was no evidence of fraud.

Only Doolan and Thyssen (the latter being a debt incorporated into the Foremost guaranty) filed proofs of claim. Because there must be a valid claim of the primary creditors, this might have prevented Perlman's use of his guaranties of the other debts for setoffs. However, the trustee stipulated that amounts were actually owed by the debtor corporation to most of the creditors equal to or in excess of the amounts claimed as setoffs.

■ As to Foremost, the claims for payment of legal expense appear doubtful, but

because the trustee has stipulated to those amounts the Court will not look behind them, even though the defendant also sought to prove them by documentary evidence. (The entire issue is probably moot, however, because the amount paid on this guaranty by Perlman is much less than the total amount due.)

█ As to Heller, the trustee agreed that Heller had a deficiency of $939,000 on its debt, after the sale of Monex's collateral, but argued that Heller had waived the deficiency and that therefore Perlman, as a guarantor, could not assert that debt. The Court concludes that Perlman may still assert the validity of the Heller debt for this purpose, although the question is a close one. Heller entered into an agreement with Monex (Plaintiff's Composite Ex. 12) whereby Heller waived any deficiency against Monex and agreed that its retention of the Monex collateral would "constitute a satisfaction" of Monex's obligations to Heller. Ordinarily such an agreement would also release a guarantor because the entire underlying debt has been released. However, Heller further provided in the same agreement that Heller reserved any claims against any guarantor, and Perlman signed the agreement, although he signed for Monex, in his capacity as president of Monex.

Prior to making the sale, Heller also secured the assent of Perlman as guarantor, and Perlman acknowledged that the sale would bring less than the full amount Monex Corporation owed to Heller, and that he, Perlman, would still be liable as guarantor. (Plaintiff's Composite Exhibit 25). Neither the trustee nor Perlman has provided the Court with any law regarding the legal effect of such agreements and whether or not a guarantor is released from his guaranty under these circumstances. The Court concludes that it should give effect to the retention of liability against the guarantor, in order to give effect to the spirit of the agreements rather than the language. For the same reason, the language of the Heller agreement with Monex regarding the surrender of col-

lateral will not defeat Perlman's use of the Heller guaranty as a setoff.

Thus the setoff defense is not defeated on the basis that any of the primary creditors' claims were invalid.

█ Finally, Perlman has the burden of proving the amounts actually paid on the guaranties. A setoff is the equivalent of a distribution of estate proceeds. Since either a direct claim or a claim through a subrogation is allowed only to the extent paid at the time of allowance, there is no reason to permit a setoff for more. At the time of trial Perlman had paid $25,000 on the Ryder guaranty, $10,000 on the Doolan guaranty, and $75,000 on the Foremost guaranty, as evidenced by documents, as well as being stipulated to by the trustee. Perlman attempted to prove that payments on the guaranty to Heller have been made, but the Court finds that he has failed to carry his burden of proving any amount of payment on the Heller guaranty. Payments are currently being made by Metal Studs to Heller. Metal Studs has an ongoing relationship with Heller. Perlman essentially testified that everything is turned over by Metal Studs to Heller, and Heller applies it however it wants. James Spector, of Heller, testified that Perlman and Heller were attempting to work out an arrangement for payment, but did not testify to any amounts which had been paid by Perlman under the guaranty to the time of trial. Perlman's guaranty of the Heller debt was secured by mortgages on real property owned personally by Perlman, but the mortgages were not in foreclosure and the mere giving of collateral is not the equivalent of payment for purposes of determining entitlement to the right of setoff under the Bankruptcy Code.

Therefore, the amount of guaranty debt which Perlman will be permitted to offset, as having satisfied each of the necessary elements, is $110,000.00.

█ The trustee has argued that the right to setoff rests with the discretion of the Court and that such discretion is to be

exercised under general principles of equity. Even if there is some leeway for the discretion of the Court under the Bankruptcy Code, this Court concludes that it is not inequitable to allow a setoff to Perlman to the extent determined. Any setoff is preferential and unfair to other unsecured creditors to the extent that it is allowed, but bankruptcy law nevertheless provides for setoffs under particular circumstances. The guaranties are genuine liabilities of Perlman, and they were taken by the creditors involved at the time credit was extended to Monex because those creditors chose to protect themselves in that way. Thus this case is unlike the case of *New York Credit Men's Adjustment Bureau, Inc. v. Mintz (In re Pleasure Fabrics Corp.)*, 21 C.B.C. 395 (Bkrtcy., S.D.N.Y.1979), where the principal of the corporation selectively paid creditors (personally) without any obligation to do so. In addition, the recovery which the trustee sought from the principal in that case was for a fraudulent conveyance to him from the corporation, and the court concluded that the debts were not mutual.

Based on the preceding findings and conclusions, the Court finds that defendant Milton Perlman owes the trustee a total of $190,783.00, of which $110,000.00 may be offset by amounts he has paid on guaranties, leaving a net of $80,783.00 owed to the trustee.

Pursuant to Bankruptcy Rule 9021(a), a Final Judgment incorporating these Findings and Conclusions is being entered this date.