**In the Matter of BALDWIN–UNITED CORPORATION, D.H. Baldwin Company, et al., Debtors.**

**Bankruptcy No. 1–83–02495.**

United States Bankruptcy Court, S.D. Ohio, W.D.

Dec. 13, 1985.

Richard Parker, O'Melveny & Myers, Washington, D.C., Robert White, O'Melveny & Myers, Los Angeles, Cal., Attys., for debtors Baldwin-United Corp. and D.H. Baldwin Co., et al.

Eva H. Posman, Gaston, Snow, Beekman & Bogue, New York City, for Paine Webber, Inc.

Lawrence J. Fox, Drinker, Biddle & Reath, Philadelphia, Pa., for W.H. Newbold's & Sons.

Lloyd Clareman, Finley, Kumble, Wagner, Heine, Underberg, Manley & Casey, New York City, for Shearson Lehman/American Express, Inc., Robinson-Humphrey Co. & American Express, Inc.

Richard Levy, Jr., Esanu, Katsky, Korins & Siger, New York City, for Planco, Inc.

### ORDER RE CLAIMS OF NON–SETTLING BROKERS

RANDALL J. NEWSOME, Bankruptcy Judge.

These Chapter 11 cases are before the Court pursuant to the Debtors' objections to claims filed by Edward D. Jones and Company (Claim 7232), J.C. Bradford and Company (Claim 7109), Paine Webber, Inc.,

et al (Claim 7022), Piper, Jaffrey and Hopwood, Inc., et al (Claims 6963, 6864, 6965 and 6472), Planco, Inc. (Claim 7108), Robinson Humphrey/American Express, Inc. (Claims 7195 and 7197), Shearson Lehman/American Express, Inc. (Claims 7196 and 7198), and W.H. Newbold's Sons and Company (Claim 7074) (hereinafter, the "Brokers").[1]

## I. PROCEDURAL HISTORY

Beginning in 1979, certain insurance companies owned by the Debtors began marketing a product known as a single premium deferred annuity ("SPDA"). Approximately 75% of these SPDAs were sold through broker-dealers. An SPDA was purchased with a one-time payment to the insurance company (the average payment was approximately $23,000) (See, Transcript of Proceedings, Doc. 21–41 at 159). In turn, the insurance company agreed to pay back that amount with interest at a date in the future. .The insurance companies agreed to pay a high guaranteed interest rate for the first year and a variable rate thereafter with a guaranteed minimum of 7.5% for years two through ten and 4% thereafter.

Through a series of events which have been documented in the Court-appointed Examiner's Report filed in these cases (See, Consolidated Case No. 1–83–02495, Doc. #1453), the insurance companies were placed in rehabilitation proceedings by the state insurance regulators of Arkansas and Indiana (the "Rehabilitators") on July 13, 1983.[2] A rehabilitation plan was adopted by both rehabilitation courts in March of 1984 and became effective May 1, 1984. That plan provides for a 100% return of principal and accumulated interest to July 13, 1983; a 100% return of the interest rate guaranteed each policyholder for the first year the policy was owned; 9.5% interest on the July 13, 1983 accumulated value through May 1, 1984; and a 5.5% interest rate thereafter until November 1, 1987 or completion of the Rehabilitation Plan.

On September 28, 1984, the Rehabilitators each filed proofs of claim in these Chapter 11 cases for "not less than $2,000,000,000" alleging that Debtors had improperly obtained cash from the insurance companies in exchange for securities issued by the Debtors and affiliated companies ("the Affiliate Securities") and held by the insurance companies. These Affiliate Securities were found by the Arkansas rehabilitation court to be of uncertain value and liquidity. In response to the Rehabilitators' proofs of claim, the Debtors filed counterclaims for the return of approximately $1.2 billion in preferences and fraudulent conveyances held by the insurance companies. There followed several months of negotiations culminating in a settlement of all claims between the Debtors and the Rehabilitators. That settlement was approved by both Rehabilitation Courts and the Bankruptcy Court in February of 1985 and amended in November of 1985.[3] As part of that settlement, the Debtors will pay approximately $170 million to the Rehabilitators and the Rehabilitators will return the Affiliate Securities to the Debtors.

Beginning September 29, 1983, three days after the involuntary bankruptcy peti-

1. The claimants are entities named as defendants by plaintiff SPDA purchasers in In re Baldwin-United Corporation (Single Premium Deferred Annuities Insurance Litigation), MDL No. 581 (S.D.N.Y.) ("MDL 581"), and at the time of filing of the instant objections, had elected not to enter into a settlement approved by Judge Brieant in that MDL action.

While neither their claims nor objections thereto have been withdrawn, it is the Court's understanding that Edward D. Jones and Company, Piper, Jaffrey and Hopwood, Inc. and J.C. Bradford and Company have since joined the MDL settlement, and that for purposes of Con-

tested Docket #21 their claims are not at issue. Furthermore, Claim 6965 filed by Piper, Jaffrey has been withdrawn as being a duplicate of claim 6472.

2. Involuntary Chapter 11 petitions were filed against Baldwin-United Corporation and D.H. Baldwin Company on September 26, 1983. Both entities consented to the jurisdiction of this Court on the following day.

3. Hearing on approval of the amended agreement is scheduled in this Court for December 17, 1985.

tions were filed against the Debtors, holders of SPDAs filed class-action suits against the broker-dealers who marketed the SPDAs. Eventually, 40 actions pending in nine federal jurisdictions were transferred and assigned to the Honorable Charles Brieant, United States District Judge for the Southern District of New York, for consolidated proceedings under 28 U.S.C. § 1407. *In re Baldwin-United Corp. Litigation, No. 581*, 581 F.Supp. 739 (J.P.M.L.1984) Due to the automatic stay provisions of 11 U.S.C. § 362, Baldwin was not named as a defendant in any of the actions.

Prior to the July 25, 1984 bar date for filing proofs of claim in these bankruptcy cases, Paine Webber, Inc., filed a proof of claim for $700 million against Baldwin-United for indemnity and contribution in connection with the MDL 581 actions, as well as a lawsuit filed against it by the Commonwealth of Massachusetts and other proceedings that "have been or may be commenced by various state and federal regulatory bodies." (Cl.Ex. 63, PW Ex. H at 5)

Claim No. 7108 filed by Planco, Inc. is for not less than $30 million and seeks indemnity and/or contribution in connection with 12 of the lawsuits consolidated in MDL 581. (Cl.Ex. 65, PL.Ex. Q) Planco, Inc. apparently served as consultant to the insurance subsidiaries with regard to the SPDAs and did not actually market the policies. (*See*, Affidavit on Behalf of Planco, PL.Ex. R)

Robinson Humphrey/American Express filed proofs of claim for indemnity and contribution in an undetermined amount in connection with two actions consolidated in MDL 581, three Alabama state court actions and one North Carolina state court suit. (Cl.Exs. 59, 61; RH Exs. H, I)

Shearson Lehman/American Express filed proofs of claim for indemnity and contribution in an undetermined amount in

connection with four MDL 581 suits and five state court suits. (Cl.Exs. 60, 62; SH. Exs. O, P)

W.H. Newbold's Sons and Company filed a proof of claim for an undetermined amount for indemnity and contribution in connection with one of the MDL 581 suits. (Cl.Ex. 64, WHN Ex. E)

Each claim is contingent and unliquidated in that there has been no determination in MDL 581 or any other proceeding that the Brokers are liable to the policyholders and it is undisputed that none of the Brokers, with the exception of Planco, Inc.,[4] have yet paid any amount to any policyholder or any State in connection with the suits or regulatory actions currently pending. Likewise, there has been no determination of the Debtors' liability, if any, to the Brokers. Pursuant to 11 U.S.C. §§ 105 and 362 and previous orders of this Court and the U.S. District Court for the Southern District of Ohio, the Brokers are prohibited from filing or proceeding on third-party complaints against the Debtors in MDL 581. (*See, Baldwin-United Corp. v. Paine Webber Group, Inc.*, Adv. No. 1–85–0251 (Bankr.S.D. Ohio, July 30, 1985), (Newsome, J.), *aff'd*, C–1–85–1509, —— B.R. —— (S.D. Ohio, October 22, 1985) (Porter, J.)

Certain holders of SPDAs also filed proofs of claim in these bankruptcy cases on behalf of themselves and on behalf of a "class" of SPDA holders. The Debtors objected to those "class claims." By Order of August 7, 1985, this Court disallowed the claims insofar as they purported to be filed on behalf of a class.

## II. THE DEBTORS' LEGAL OBJECTIONS

The Debtors have objected to the Brokers' claims on four grounds. First, Debtors argue that as a result of Rehabilitation Plans adopted by the Courts in Arkansas and Indiana, the only loss suffered by the

---

**4.** Planco is a "settling broker" in connection with those MDL suits in which it is named as a defendant along with a settling broker. It is a "non-settling broker" insofar as it is named as a

defendant in suits filed against non-settling brokers. *See*, Enhancement Plan, Recital Twenty-Four (Cl.Ex. 67).

policyholders is lost interest resulting from the Rehabilitation proceedings and that such interest, accruing post-petition, is not recoverable under 11 U.S.C. § 502(b)(2). Therefore, Debtors assert, the claim must be disallowed under 11 U.S.C. § 502(e)(1)(A).

Second, since no judgments have been entered against the Brokers in MDL 581 or any other action, nor have the Brokers paid the policyholders with respect to the MDL claims or any other claims arising from the sale of SPDAs, the Debtors ask that the claims be disallowed pursuant to 11 U.S.C. § 502(e)(1)(B). In addition, since the Debtors will pay, under the terms of their settlement agreement with the Insurance Commissioners of Arkansas and Indiana, $170+ million to the Rehabilitators which will be distributed to policyholders, the Debtors urge that this settlement be credited toward any contribution claim so as to prevent double recovery from the Debtors' estates.

Third, Debtors argue that neither indemnity nor contribution is available to the Brokers under either federal or state law and thus these claims should be disallowed under 11 U.S.C. § 502(b)(1).

Finally, the Debtors assert that the fixing or liquidating of any liability between the Brokers and policyholders and the Debtors and Brokers would unduly delay the closing of the case. They therefore request an estimation of the claims pursuant to 11 U.S.C. § 502(c) in the event the claims are not disallowed.

After holding a pre-trial conference on the objections, the Court reserved ruling on the legal issues raised under 11 U.S.C. § 502(e) and scheduled hearings in the form of a summary trial on the estimation of the claims for December 3 and 4, 1985.

We now turn to the Debtors' arguments on disallowance and the Brokers' responses which we heard and took under submission on September 30, 1985.

## A. SCOPE OF § 502(e)(1)

Section 502(e)(1) requires the Court to "disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on ... the claim of a creditor" under certain circumstances.

Initially the Brokers argue that § 502(e) is not applicable to them on the ground that the language "entity that is liable with the debtor on a claim" should not be construed to include joint tortfeasors. Rather they assert that the statute's application is limited to those entities incurring contractual obligations with the debtor. (Memorandum in Support of Claimants, Doc. 21–8, pp. 11–14.)

Their argument is without merit. First, the plain language of the statute contains no such limitation. The phrase "an entity that is liable with the debtor" is broad enough to encompass any type of liability shared with the debtor, whatever its basis. Had Congress intended to limit the section to contractual claims it could easily have written "entity that is *contractually* liable with the debtor."

Second, the legislative history of §§ 502(e) and 509 lends no weight to their contention.[5] The language in the legislative history of § 502(e) speaks of claims of a "codebtor," "surety," or "guarantor." (H.R.Rep. No. 95–595, 95th Cong. 1st Sess. 354 (1977); S. Rep. No. 95–989, 95th Cong.2d Sess. 65 (1978)), U.S.Code Cong. & Admin.News 1978, p. 5787. The legislative history of § 509 speaks of "surety, guarantor or co-maker." (H.R.Rep. No. 595, 95th Cong. 1st Sess. 358 (1978); S. Rep. No. 989, 95th Cong., 2d Sess. 73 (1978)). We would agree that the terms "surety," "guaran-

---

5. The Brokers argue that "§ 502(e) cannot be read without reference to § 509" (Memorandum in Support of Claimants, Doc. 21–8 at 14), and that by reading both together we must conclude that Congress' "clear intent [was] to apply the disallowance and subrogation provisions of sections 502 and 509 of the Code to contractual claims only." (*Id.* at 13.) The Brokers have

ignored the first sentence of the legislative history of § 509, which states that "section 509 deals with codebtors generally, and is *in addition* to the disallowance provision in section 502(e)." (emphasis supplied.) That sentence indicates to us a Congressional intent to add special provisions regarding subrogation rather than to limit the disallowance provisions of § 502(e).

tor" and "co-maker" are words of contract, but find no such connotation to the word "codebtor." While "codebtor" is not defined in the Bankruptcy Code, nor in the predecessor Act, and only a handful of decisions have addressed the question, at least three courts have extended the definition beyond contract situations. In *Pension Benefit Guaranty Corp. v. White Motor Corp., (In re White Motor Corp.)* 731 F.2d 372 (6th Cir.1984), the Sixth Circuit held that the Pension Benefit Guaranty Corporation was a codebtor with standing to file a proof of claim even though its liability arose from a source different from that of the debtor's. *Id.* at 374. In *In Re Dubose,* 22 B.R. 780 (Bankr.N.D.Ohio 1982) the Court held that partners who were jointly and severally liable on tax obligations were codebtors for purposes of the Bankruptcy Code. *Id.* at 782. In a case interpreting the Bankruptcy Act, the Supreme Court of Appeals of West Virginia held that an employer jointly liable with an employee for the employee's negligent acts was a codebtor for purposes of § 16 of the Act. *State ex rel. Bumgarner v. Sims,* 139 W.Va. 92, 79 S.E.2d 277, 293 (1953).

■ The Brokers also contend that they cannot be codebtors within the meaning of § 502(e) because not all of their claims against the Debtors are derivative of the policyholders' claims against the Brokers. (Memorandum in Support of Claimants, Doc. 21–8 at 10 fn.) A review of each of the proofs of claim at issue fails to support this contention. There are no direct claims against the Debtors.[6] Rather, each of the Brokers' proofs of claim asserts a claim for indemnification and/or contribution for any liabilities to which the Brokers may become subject in connection with present or future actions based upon the sale of SPDAs. Whether the claims are derivative of the policyholders' claims or claims of state regulators or some other entity, the result is the same: By its very nature a claim for contribution presupposes a sharing of liability and thus a codebtor relationship.[7]

Furthermore, the Brokers' arguments distort the meaning of the words used in § 502(e). Section 502(e)(1) mandates the disallowance of *"any claim* for reimbursement or contribution" (emphasis supplied). "Claim" is defined in § 101(4) of the Code in the most expansive of terms to provide "the broadest possible relief in the bankruptcy court." H.R.Rep. No. 95–595, 95th Cong. 1st Sess. 309 (1977); S.Rep. No. 95–989, 95th Cong. 2d Sess. 21 (1978), U.S. Code Cong. & Admin.News 1978, pp. 5808, 6266. This expansive definition certainly encompasses tort claims, regardless of whether they are contingent or unliquidated. By force, such claims are subject to treatment under § 502 and are subject to the discharge provisions of the Code as well.[8]

We also find it unlikely that Congress would draft § 502(e) using the term "contribution" had it intended to limit its scope to contract situations, since the concept is equally applicable in tort situations:

> The right to contribution, where one person discharged more than his just share of a common burden, did not arise from contract, but had its foundation in, and was controlled by, principles of equity and natural justice.

*Pension Benefit Guaranty Corp. v. Tenn-Ero Corp., et al (In re Tenn-Ero Corp.,)*

---

**6.** If the Brokers have claims against the Debtors unrelated to liability from the sale of SPDAs, they have not yet asserted them, and are now time-barred from doing so. (*See,* Consolidated Case No. 1–83–02495, Order Fixing Last Date to File Claims and Interests, Procedure Therefor and Notice thereof, March 2, 1984, Doc. 521.)

**7.** The availability of indemnification to the Brokers is discussed *infra.*

**8.** The unavailability of bankruptcy relief under the Act (and its predecessors) for a debtor fac-

ing tort claims apparently stemmed from the original use of bankruptcy law in commercial transactions. "The reason for this traditional principle is historical rather than rational ... [T]here is no conclusive reason for treating a creditor *ex lege* any worse than a creditor *ex contractu* ... [y]et, unless a claim *ex delicto* can be said to come under one of the recognized exceptions, it is under the present law not provable." 3A *Collier on Bankruptcy* ¶ 63.25[1] at 1891–92 (14th ed. 1975).

14 B.R. 884, 891 (Bankr.D.Mass.1981); aff'd, 32 B.R. 63 (D.Mass.1982); remanded, 711 F.2d 1085 (1st Cir.1983); cert. denied 464 U.S. 961, 104 S.Ct. 393, 78 L.Ed.2d 337 (1983); See also, Restatement (Second) of Torts, § 886A (1977).

In order to judge the applicability of specific arguments under § 502(e) to the Brokers' claims, we must consider in greater detail the events that have occurred in this Court, the Rehabilitation Courts of Arkansas and Indiana, and the multidistricted policyholder litigation in New York.

When the insurance company subsidiaries of the Debtors entered insurance rehabilitation proceedings on July 13, 1983, the Order of Rehabilitation as well as the applicable state statutes charged the Insurance Rehabilitators with the responsibility of conducting the business of the insurance companies for the benefit and in the interest of the policyholders, creditors and public, and with implementing a Plan of Rehabilitation. See, Ark.Stat.Ann. §§ 66–4801 et seq. (1980); Ind.Code §§ 27–9–1–1 et seq. (1984), Orders of Rehabilitation, (Cl.Exs. 53, 54).

In exercising that responsibility, the Rehabilitators formulated Plans of Rehabilitation which were approved by the courts of Indiana and Arkansas in March of 1984. Those plans provided for:

(1) a 100% return of all premiums paid (i.e., a full return of principal), plus accumulated interest to July 13, 1983;

(2) a 100% return of the interest rate guaranteed for the first year the policy is owned, even if the policy was in its first year at the time the companies entered rehabilitation.

(3) Beginning on the latter of July 13, 1983, or the expiration of the first policy year, 9.5% interest through May 1, 1984 on the July 13, 1983 accumulated value.

(4) a 5.5% interest rate thereafter until November 1, 1987, or completion of the Rehabilitation Plan.

These provisions were made possible by pooling the assets of all six insurance companies, with distribution to be on an equitable pro rata basis to all policyholders.

On September 28, 1984, the Arkansas and Indiana Rehabilitators filed proofs of claim in these bankruptcy cases for an aggregate of not less than $4 billion. (See, Consolidated Case No. 1–83–02495, Claims Nos. 8272, 8273.) Those proofs of claim were identical and stated that the claims were submitted jointly,

because any recovery from the estate of the debtors will be applied to the joint pool of resources provided by the court-approved Arkansas and Indiana Rehabilitation Plans for payment to all policyholders of the six insurance companies equitably on a pro rata basis under the options provided by the Rehabilitation Plans.

See, Claims 8272, 8273 at 1, 2.

Shortly after these claims were filed the Debtors filed objections, affirmative defenses and counterclaims to the claims. After some months of extremely difficult negotiations the Debtors and Rehabilitators reached a settlement of their differences (the "Global Settlement") on January 4, 1985. That settlement was approved by this Court by Order entered February 19, 1985 [9] and was also approved by both Rehabilitation Courts. Among other provisions, the agreement calls for the Debtors to pay the Rehabilitators $170 million in cash, adjusted up or down according to certain contingencies, the Rehabilitators to return to the Debtors the Affiliate Securities, and the parties to exchange releases. The parties also agreed to resolve outstanding tax issues and assign the non-affiliate assets to the Rehabilitators "in order to facilitate the development and implementation of an SPDA enhancement plan." See, Consolidated Case No. 1–83–02495, Doc. 1474, Ex. A., Article II, § 2.1.)

After several more months of arduous negotiations between the Debtors and representatives of the Internal Revenue Service and the Justice Department, the tax settlement contemplated in the Global Set-

9. See, Consolidated Case No. 1–83–02495, Doc. 1516.

tlement was finally achieved as part of an overall settlement of the Debtors' tax liabilities. It was approved by this Court on September 30, 1985,[10] and cleared the way for the transfer of the non-affiliate assets into an enhancement plan for the benefit of the SPDA holders. (*See,* Consolidated Case No. 1-83-02495, Doc. 1930 at 13; Enhancement Plan Agreement, §§ 3.02(a), 3.03(a)(ii) (Cl.Ex. 67)).

Finally, in September, 1985, an Enhancement Plan Agreement ("Enhancement Plan") was entered into by the Metropolitan Life Insurance Company, the Insurance Commissioners of Arkansas and Indiana, liaison counsel for the settling plaintiffs in MDL 581, and 19 settling defendants in MDL 581. (Cl.Ex. 67). The stated purpose of the Enhancement Plan is to benefit all persons who purchased SPDAs issued by Baldwin-United insurance subsidiaries

> by increasing the benefits realized by such persons through the ongoing rehabilitation proceedings involving such insurance companies and by alleviating concerns as to the certainty of receiving such benefits through the participation of Metropolitan Life Insurance Company in its individual capacity and as designee of certain participating life insurance companies. This Enhancement Plan Agreement is intended to put to rest all manner of controversies related to the foregoing, and provides for the cooperative mechanism necessary to the effectuation of the benefits intended hereunder.

Enhancement Plan Preamble.

Recital Twenty-Eight of the Enhancement Plan states that:

> The Rehabilitators of the Companies have made and entered into a settlement agreement with Baldwin-United and D.H. Baldwin Company, as debtors in possession, as of January 4, 1985 (the "Baldwin

Settlement") which provides, *inter alia,* that the Rehabilitators may, subject to certain contingencies, receive one or more payments in settlement of all claims and counterclaims (related and unrelated to the Affiliate Assets) between the Rehabilitators and Baldwin-United and its affiliates, which payments may be directed to fund an overall enhancement plan.

Section 3.09 of the Enhancement Plan provides that the Rehabilitators will "transfer irrevocably from time to time and when realized all net proceeds from the Baldwin Settlement [the Global Settlement] and the Affiliate Assets (other than the Settlement Affiliate Assets) to the Overall Fund as soon as such proceeds become available to them, free and clear of all liens, claims, charges, judgments and other encumberances of any kind whatsoever." In addition, the Rehabilitators grant a security interest in those proceeds to the Metropolitan Life Insurance Company in its individual capacity and as designee of the participating insurance companies "to the effect that such proceeds and amounts shall ... be irrevocably transferred to the Overall Fund." *Id.* § 3.09(a)(c).

Finally, § 3.07 of the Enhancement Plan allocates the proceeds from the Global settlement to "all SPDA policyholders and AP (Accumulation Policy) policyholders on the basis of their respective proportional shares." *Id.* at §§ 3.07(a).

## B. DISALLOWANCE UNDER § 502(e)(1)(A).

■ We turn now to § 502(e)(1)(A). This section requires the disallowance of a claim for contribution to "the extent that such creditor's [11] claim against the estate is disallowed."

---

**10.** *See,* Consolidated Case No. 1-83-02495, Doc. 2021.

**11.** Both the Debtors and the Brokers have read the "such creditors" language in this instance to mean the policyholders. We would point out that the policyholders are primarily creditors of the Debtors' insurance subsidiaries, not of the Debtors, a fact that appears to have been recog-

nized by the policyholders themselves, since only 13 policyholders of an estimated 165,000 filed proofs of claim against these estates. Claims purportedly filed on behalf of an entire class of policyholders have been previously disallowed by this Court. Whether we view the policyholders or the Rehabilitators in their representative capacity as creditors for purposes of

The primary underlying claim against these estates upon which the Brokers seek contribution in the event they are held liable is the damages suffered by the policyholders by reason of the insurance company Rehabilitation Proceedings. For reasons that will be dealt with later in this opinion, we believe the Brokers will not be found liable to the MDL plaintiff policyholders, and their claims, were we not disallowing them, would be estimated at zero.

Be that as it may, any damages actually suffered by the policyholders are a result of the reduced rate of interest paid to them under the Rehabilitation Plan. This will be the case no matter which damage theory is ultimately adopted by the MDL court. There is no dispute that the policyholders will receive 100 per cent of their principal. They will also receive a minimum 9.5% interest rate through May, 1984 (2% above the minimum guaranteed contract rate) or 100% of the high guaranteed contract rate if the policy was still in its first year at the time the companies entered rehabilitation proceedings. After May 1, 1984, that rate dropped to 5.5%. (Under the Enhancement Plan policyholders will receive interest in addition to that provided for in the Rehabilitation Plan. *See*, Exhibit K to Enhancement Plan (Cl.Ex. 67)).

Since the policyholders' loss on interest did not occur until May 1, 1984, some eight months after the Debtors filed for Chapter 11 protection, we must conclude that the damages suffered by the policyholders constitutes a claim for unmatured interest, and were such a claim asserted directly by the policyholders it would be disallowed pursuant to § 502(b)(2).

The legislative history of § 502(b)(2) states that:

Interest disallowed under this paragraph includes postpetition interest that is not yet due and payable.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 352 (1977), U.S.Code Cong. & Admin.News 1978, p. 6308.

§ 502(e)(1)(A), we believe the result to be the

Thus it has been held that to the extent the claim of a creditor includes unmatured interest, the creditor is not entitled to claim precomputed interest over the lifetime of a loan, *In re Morris*, 8 B.R. 924, 925 (Bankr. N.D.Ohio 1981); and a guarantor of letters of credit has been held not liable for postpetition interest owed by the debtor to the bank issuing the letters of credit. ("First Bank should not be allowed to accomplish indirectly what it could not accomplish directly under § 502(b)(2).) *In re Hart Ski Mfg Co., Inc.*, 7 B.R. 465, 469 (Bankr.D. Minn.1980).

Since "a surety's claim for reimbursement or contribution is entitled to no better status than the claim of the creditor assured by such surety," (124 Cong.Rec. H 11,094 (daily ed. Sept. 28, 1978)), the contribution and/or indemnity claims of the Brokers insofar as they seek to recover any damages assessed against them for injury to SPDA holders, must be DISALLOWED pursuant to 11 U.S.C. § 502(e)(1)(A) and § 502(b)(2).

### C. DISALLOWANCE UNDER § 502(e)(1)(B)

 Section 502(e)(1)(B) is equally fatal to the Brokers' claims. This section requires the disallowance of a claim for contribution "to the extent that ... such claim ... is contingent as of the time of allowance or disallowance of such claim."

Neither the Debtors nor the Brokers have cited any case law interpreting this provision and our research has revealed no cases on point.

 A reading of both the legislative history and authoritative commentators leads to the following conclusions. (*See, generally*, H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 354 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 65 (1978); 124 Cong.Rec. H. 11,094 (Sept. 28, 1978); S. 17,410–11 (Oct. 6, 1978); 3 *Collier on Bankruptcy*, ¶ 502.05, at 502–83–93 (15th ed. 1979). Under § 502(a), a claim filed pursuant to § 501 is deemed allowed unless objected to. Thus, if no objection is filed to same.

a claim, the "time of allowance or disallowance" would be the date of filing. An objection on a § 502(e)(1) ground will trigger a hearing and ruling on the objection (*See*, Bankruptcy Rule 3007) and thus, the "time of allowance or disallowance" will be the date of the ruling.

■ The codebtor asserting a claim for contribution has no right to any distribution from the debtor's estate until the creditor's claim has been paid in full.[12] Thus, if a codebtor has not paid the creditor and established his right to payment from the debtor as of the date of the ruling on the objection, his claim is contingent and must be disallowed under § 502(e)(1)(B). This principle is illustrated in the few cases which have even cited the statute. For example, in *In re McCrady*, 7 C.B.C.2d 328, 23 B.R. 193 (Bankr.W.D.Ky.1982), McCarty (co-maker) was required to pay a promissory note jointly with McCrady (debtor) or individually if McCrady did not contribute funds. "Thus, McCarty is the holder of a contingent claim against McCrady that becomes fixed when he pays the balance on the note." *Id.* at 330, 23 B.R. 193. In *In re Monex Corp.*, 43 B.R. 879 (Bankr.S.D. Fla.1984) the court determined that "even if [the creditor] had filed a claim, under 11 U.S.C. § 502(e) there are special provisions which affect the allowance and disallowance of claims based on guaranties. Under that subsection, [the creditor's] claim could not be allowed if the debt which he guarantied was disallowed as a claim by the primary creditor, if his claim was still contingent at the time of the allowance, or if he had requested subrogation under 11 U.S.C. § 509." *Id.* at 886.

■ If the codebtor pays the creditor postpetition but prior to allowance or disallowance, the codebtor's claim will be allowed to the extent paid, if otherwise allowable under § 502, as if it were paid prepetition. 11 U.S.C. § 502(e)(2). Read together, § 502(e)(1)(B) and (e)(2) evince Congressional intent that the codebtor will be allowed his claim for contribution only to the extent he has paid the debtors' creditor. Section 502(e)(1)(C) then disallows any claim for contribution if the claimant has also asserted a right of subrogation under § 509, thereby requiring the codebtor to elect either a claim for contribution or one for subrogation. This statutory scheme thus protects the debtor's estate from making multiple payments on a single claim.

In the situation at hand, the Brokers have made no payments to the policyholders or any other entity through litigation, individual settlements, participation in the Enhancement Plan or payment via the Rehabilitators. They may never make any such payment, and are vehement in their assertions that they bear no liability in connection with the sale of SPDAs. Their claims are, therefore, contingent and must be **DISALLOWED** pursuant to 11 U.S.C. § 502(e)(1)(B).

**D. SECTIONS 503 and 507 NOT APPLICABLE TO BROKERS' CLAIMS.**

■ The Brokers contend that their contribution and indemnity claims arose postpetition and thus are allowable as a § 507 priority administrative expense pursuant to § 503. First we would note that none of the brokers' claims were filed as administrative priority claims.

Second, and putting aside the prepetition vs. postpetition claims argument,[13] we are

---

**12.** *See*, 11 U.S.C. § 509(c), which states:
(c) The court shall subordinate to the claim of a creditor and for the benefit of such creditor an allowed claim, by way of subrogation under this section, or for reimbursement or contribution, of an entity that is liable with the debtor on, or that has secured, such creditor's claim, until such creditor's claim is paid in full, either through payments under this title or otherwise.

**13.** This argument has been strenuously litigated now in two forums, with a third considering the

question briefly in a footnote. *See, Baldwin-United Corp. v. Named Defendants*, 48 B.R. 901, (Bankr.S.D.Ohio 1985), *aff'd, Baldwin-United Corp. v. Paine Webber Group, Inc.*, 57 B.R. 759 (S.D.Ohio 1985) (Porter, J.), *In re Baldwin-United Corp. Litigation*, 765 F.2d 343, 348 n. 4 (2d Cir.1985). The brokers have been unsuccessful to date in convincing any of the three courts that their claims are post-petition. Even if the Brokers eventually prevail on their argument in some forum, they will still fail to clear the hurdle of "actual and necessary" expense of preserving, maintaining or rehabilitating the estate.

at a loss to see how the Brokers could seriously argue that these claims are administrative expenses. Administrative expenses are those actual and necessary expenses incurred by the debtor-in-possession for the maintenance, preservation or rehabilitation of the bankruptcy estate. 11 U.S.C. §§ 503(b)(1)(A)–(b)(6). *See, In re Mammoth Mart, Inc.,* 536 F.2d 950, 954 (1st Cir.1976.)

The claims for contribution and indemnity, and the tremendous expense involved in litigating these issues to date, cannot be categorized as an actual and necessary cost and expense of preserving the estate (§ 503(b)(1)(A)), of recovering property for the benefit of the estate (§ 503(b)(3)(B)), or of making a substantial contribution to the estate. (§ 503(b)(3)(D)). To the contrary, the magnitude of these creditors' claims and the manner in which they have been pressed have the potential of barring recovery by *any* creditors of these estates.

As stated by District Judge Porter in *In re Baldwin-United Corp.,* 43 B.R. 443 (S.D.Ohio 1984):

> Bankruptcy Code provisions for allowing first priority to post-petition administrative expenses are based on the balance between two factors critical to Chapter 11 proceedings: maintaining the estate in as inviolate a form as possible for the benefit of creditors while allowing essential costs of administering an ongoing business venture to be paid up front, thereby giving the debtor its best shot at emerging as a vital concern.

*Id.* at 452.

Since the Brokers' claims do not in any way benefit the estate, they are hereby **DISALLOWED** as administrative priority claims under §§ 503 and 507 of the Code.

### III. ESTIMATION OF THE BROKERS' CLAIMS.

While we have disallowed the Brokers' claims in their entirety pursuant to 11

U.S.C. §§ 502(e)(1)(A), 502(b)(2), 502(e)(1)(B), 503 and 507, in the interest of setting forth as complete a record as possible we will address the issues raised by the estimation hearings on these claims. For the reasons set out below, were the claims allowable we would estimate their value, pursuant to § 502(c), at zero.

### A. THE BROKERS' DUE PROCESS OBJECTIONS.

Before launching into a discussion of the issues involving the merits of the Brokers' claims, we must first address the Brokers' objections to the estimation process. The Brokers have strenuously and consistently argued that a fair estimation of their claims for contribution and indemnity is impossible, because this Court cannot divine how a judge or jury will decide the SPDA holders' claims against them, and thus cannot possibly determine what debtors' liability to the Brokers might eventually be when the MDL litigation is concluded some years from now. They insist that if this Court estimates their claims at zero or at a nominal amount, "due process will be violated because the risk of erroneous deprivation of claimants' property is far too high." (Claimants' Pre-Trial Brief, p. 1).

A bit of history is necessary to establish why these arguments are misguided. Under the Bankruptcy Act of 1898 a claim was required to be both "provable" under § 63 and "allowable" under § 57 in order to qualify for participation in any distribution from the bankruptcy estate. While certain kinds of contingent and unliquidated claims were provable under § 63, they were allowable only if the amount of the claim could be estimated by the Court under § 57(d) (11 U.S.C. § 93).[14] If the Court determined that a claim was "not capable of liquidation or of reasonable estimation or that such liquidation or estima-

---

**14.** This provision, which was enacted as a part of the Chandler Act of 1938, borrowed the concepts of estimation from the English Bankruptcy Act, but otherwise codified prior case law interpreting language in § 63(b) of the old Act.

*See, Maynard v. Elliot,* 283 U.S. 273, 51 S.Ct. 390, 75 L.Ed. 1028 (1931); J. Weinstein, *The Bankruptcy Law of 1938,* at 107–108 (1938).

tion would unduly delay administration of the estate," (11 U.S.C. § 93) then the claim was disallowed. Although the creditor was precluded from sharing in any distribution from the estate, his claim survived the discharge. *See, In re Cartridge Television, Inc.*, 535 F.2d 1388, 1390 (2d Cir.1976).

The requirements that claims be both provable and allowable often frustrated the essential purpose of the Bankruptcy Act, i.e.

> to convert the assets of the bankrupt into cash for distribution among creditors and then to relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes.

*Williams v. United States Fidelity and Guaranty Co.*, 236 U.S. 549, 554–555, 35 S.Ct. 289, 290, 59 L.Ed. 713 (1915).

Since only provable and allowable debts were subject to discharge, the fresh start afforded to the debtor by the discharge was sometimes more illusory than real. This was particularly true where both liability and the amount of potential recovery on the claim were unknown, since such a claim was often deemed "so incapable of proof as to prohibit allowance." *In re Gladding Corp.*, 20 B.R. 566, 568 (Bankr. D.Mass.1982) (product liability claim against Chapter XI debtor found to be "a mere possibility," and thus neither provable nor discharged); *see also, Thompson v. England*, 226 F.2d 488 (9th Cir.1955) (contract claim contingent on debtor's business being "in a sound financial position" was provable under Section 63(a)(8), but too uncertain to be allowable under Section 57(d)). Because disallowed claims were not subject to discharge, a creditor holding such a claim might recover a greater portion of his claim from the debtor than creditors with allowed claims who were limited to a share of the distribution from the debtor's bankruptcy estate.

Disallowance, however, often worked to the severe detriment of a creditor, particularly in corporate bankruptcies. Indeed, disallowance sometimes had the effect of a complete denial of recovery on a claim. Such was the case in *In re Cartridge Television, Inc.*, 535 F.2d 1388 (2d Cir.1976). There, the bankruptcy court determined that the liquidation of claims for securities fraud filed by certain stockholders would unduly delay the administration of the estate under § 57(d), and accordingly disallowed the claims. In so doing, the court effectively denied all right of recovery on the claims since the stockholders would have nothing but an assetless shell to look to after the liquidation of the corporation had been accomplished. Nonetheless, the Court of Appeals for the Second Circuit upheld this result.

The inequities to both debtors and creditors inherent in the Act's restrictive approach to claims were swept away with the passage of the Bankruptcy Code of 1978. The concepts of provability and allowability were eliminated in favor of an all-encompassing definition of "claim," which includes any right to payment regardless of how contingent or unmatured it might be. 11 U.S.C. § 101(4). As noted in its legislative history, this definition is a "significant departure" from earlier law in that "all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case. It permits the broadest possible relief in the bankruptcy court." H.R.Rep. No. 95–595, 95th Cong. 1st Sess. 309 (1977); S.Rep. No. 95–989, 95th Cong. 2d Sess. 22 (1978), U.S. Code Cong. Cong. & Admin.News 1978, pp. 5808, 6266.

To implement this broadened concept of claims and to insure that all claims, however remote, would be subject to discharge in the bankruptcy case, Congress revised the estimation procedures of § 57(d) as follows:

> There *shall be estimated* for purpose of allowance under this section—
>
> (1) any contingent or unliquidated claim, the fixing or liquidation of which as the case may be, would unduly delay the administration of the case;

11 U.S.C. § 502(c)(1) (emphasis added).

By mandating the estimation of *all* contingent claims which cannot be liquidated

without undue delay, Congress ameliorated the harsh result of cases such as *Cartridge Television,* and at the same time increased the measure of relief flowing from the debtor's discharge. The combined effect of § 101(4) and § 502(c) is to bring all claims of whatever nature into the bankruptcy estate, and to give all claimants the same opportunity to share in any distribution from the estate. No longer will some creditors enjoy a windfall or effectively be denied any recovery based upon the provability or allowability of their claims and the financial status of the debtor after bankruptcy. Equally important, Congress has insured that the debtor will receive a complete discharge of his debts and a real fresh start, without the threat of lingering claims "riding through" the bankruptcy.

As an additional measure of protection to creditors, Congress has provided in § 502(j), as supplemented by Bankruptcy Rule 3008, that creditors may seek to have any allowed or disallowed claim reconsidered for cause, so long as the case has not been closed.[15] When read together with § 502(c), it is apparent that the estimation of a claim conclusively sets the outer limits of a claimant's right to recover either from the debtor or the estate, and that estimated claims are covered by the debtor's discharge, subject only to a § 502(j) motion for reconsideration at a later time. *In re Baldwin-United Corp.,* 57 B.R. 751, 758–759 (S.D.Ohio 1985) (Porter, J.). The Brokers do not refute Debtors' contention that the liquidation of their claims in MDL 581 would unduly delay the administration of these cases. Indeed, they concede that a final determination of the SPDA holders' claims against them is at least three years away. That estimate may be conservative. Discovery has not yet commenced, and class certification proceedings have not yet begun. Whatever judgment is rendered in the MDL litigation will almost certainly be subject to appeals. Furthermore, it is entirely conceivable that Brokers' third party action will not be tried until after Brokers' liability to the SPDA holders is established. That trial will understandably be a lengthy one, and may very well involve additional appeals. All in all, a time frame of four to five years to liquidate the Brokers' claims against the Debtors might be more realistic.

Notwithstanding this unquestioned delay, and notwithstanding the mandatory language of § 502(c), the Brokers insist that this Court is incapable of fairly estimating their claims; that the estimation procedures employed by this Court are unfair; and that their Fifth Amendment due process rights are being infringed. We disagree with each of these contentions.

■ Initially, it must be emphasized that estimation does not require that a bankruptcy judge be clairvoyant. The court need only arrive at a reasonable estimate of the probable value of the claim: "[i]n so doing, the Court is bound by the legal rules which may govern the ultimate value of the claim." *Bittner v. Borne Chemical Co., Inc.* 691 F.2d 134, 135 (3rd Cir.1982); *In re Baldwin-United Corp., supra,* at 758–759. As was noted in *In re Nova Real Estate Investment Trust,* 23 B.R. 62, 66 (Bankr.E.D.Va.1982):

> An estimate necessarily implies no certainty; it is not a finding or a fixing of an exact amount. It is merely the court's best estimate for the purpose of permitting the case to go forward and thus not unduly delay the matter.

While the Court concedes that the estimation of the Brokers' claims against the Debtors is not a simple task, we cannot agree that our statutory obligation is impossible to perform. In discharging this responsibility, we are particularly fortunate to have the views of the Honorable Charles Brieant, the District Judge overseeing MDL 581. His twenty-five page opinion approving the plaintiffs' settlement

---

**15.** While this provision was amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984, § 553(a) of the 1984 Amendments makes it clear that the 1978 version of § 502(j) is applicable to this case.

with 18 Brokers in MDL 581 contains an extensive and thoughtful analysis of well-nigh all of the legal issues which must be considered in our estimation of the nonsettling Brokers' claims. *In re Baldwin-United Corporation (Single Premium Defered Annuities Insurance Litigation),* 607 F.Supp. 1312 (S.D.N.Y.1985) ("Brieant Opinion"). While Judge Brieant made it clear that his legal conclusions would be non-binding in an actual adjudication of the MDL actions, they nonetheless provide insightful guidance and an excellent starting point for weighing the Brokers' chances of prevailing in those actions.

This preliminary assessment by the District Court is amply supplemented by the evidence and argument of the parties presented at the estimation hearing. That hearing lasted one full day, during which the parties argued the merits of their positions based upon the contents of thousands of pages of exhibits contained in twelve volumes. Obviously, this hearing bore no resemblance to a trial on the merits, which might take weeks to try. But it was certainly sufficient to provide a reasonable basis for estimating the Brokers' claims.

The basic thrust of the Brokers' objections to this proceeding centers on an alleged deprivation of due process. From their briefs and arguments, it is not entirely clear whether they assert a lack of substantive due process arising from the application and effect of § 502(c) on their claims, or a lack of procedural due process arising from the manner in which their claims are estimated.

To the extent they are complaining of the latter, their objections are without merit. Section 502(c) makes no mention of the procedure to be followed in estimating claims. The few cases interpreting this provision are in agreement that the bankruptcy court should use "whatever method is best suited to the particular contingencies at issue." *Bittner v. Borne Chemical Co., Inc.,* 691 F.2d 134, 135 (3rd Cir.1982). Because a formal trial on the merits would eviscerate the purpose underlying § 502(c), this Court suggested at a September 30,

1985 pretrial conference with the parties that procedures comparable to those used in summary jury trials might govern in the estimation hearing. The parties were given until October 10, 1985 to present alternative suggestions. None was proposed. On October 16, 1985 the Court issued an order establishing procedures for the estimation hearing. (See Ex. A attached hereto.) While generally consistent with the concept of a summary jury trial (*See, e.g., Judge T. Lambros, The Summary Jury Trial and Other Alternative Methods of Dispute Resolution,* 103 F.R.D. 461 (1984)), the procedures called for no jury, and allowed live testimony by one witness per party. The order also set a discovery cutoff date, and allotted two days for the hearing.

Given the fact that the Brokers took no discovery, called no witnesses at the hearing, and did not use all of the time allotted for their presentations, we fail to see how the estimation procedure was unfair, let alone constitutionally infirm under the Due Process Clause of the Fifth Amendment.

Indeed, it is not entirely certain whether the Brokers' objections have a legitimate constitutional underpinning. While it is beyond question that the substantive and procedural requirements of due process cannot be ignored in a bankruptcy proceeding (*cf. In re Armstrong Glass Co., Inc.,* 502 F.2d 159 (6th Cir.1974)), it is equally true that the burden is upon one complaining of a due process violation to establish the prerequisites for such a finding. *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976). The Brokers have asserted that they possess a valuable property interest which is in danger of being eliminated in violation of their due process rights, yet they have failed to define the parameters of that interest. The guidelines for determining the existence of a property interest are well-established:

To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation

of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

*Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

Here, the Brokers in effect seek to require the Debtors to set aside an enormous sum of money for their benefit in the uncertain event that they are found liable to the SPDA plaintiffs or other entities, and in the equally uncertain event that the Debtors are found liable on any third-party claims for contribution and indemnity. We are not entirely convinced that the Brokers' contingent needs rise to the level of "security interests ... in specific benefits." *Id.* at 576, 92 S.Ct. at 2708; *Compare, Martinez v. California,* 444 U.S. 277, 281–282, 100 S.Ct. 553, 557, 62 L.Ed.2d 481 (1980) (cause of action for wrongful death "arguably" is a species of "property") *with Riverview Investments, Inc. v. Ottawa Community Improvement Corp.,* 769 F.2d 324 (6th Cir.1985) (no legitimate expectation of approval of industrial revenue bonds); *Mid-South Music Corp v. Kolak,* 756 F.2d 23 (6th Cir.1984) (no property interest in injury to business arising from IRS action); and *Bosely v. City of Euclid,* 496 F.2d 193 (6th Cir.1974) (no property interest in desire to continue living in public housing).

Assuming that the Brokers do possess the requisite property interest, they have certainly been given the procedural process they are due. All that the Due Process Clause requires is that a claimant or aggrieved party be given:

'an *opportunity* ... granted at a meaningful time and in a meaningful manner,' *Armstrong v. Manzo,* 380 U.S. 545, 552 [14 L.Ed.2d 62, 85 S.Ct. 1187, 1191] (1965) (emphasis added), 'for [a] hearing appropriate to the nature of the case,' *Mullane v. Central Hanover Tr. Co.,* supra [339 U.S.], at 313 [94 L.Ed. 865, 70 S.Ct. 652 [at 656]].

*Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 437, 102 S.Ct. 1148, 1158, 71 L.Ed.2d 265 (1982). Having failed to suggest alternatives to the procedure utilized in estimating their claims, the Brokers cannot now be heard to complain.

The overriding theme of the Brokers' arguments centers more on an alleged deprivation of substantive due process. They argue that to the extent that § 502(c) requires them to establish their liability to the SPDA holders as a prerequisite to establishing the Debtors' estimated liability on their claims for contribution and indemnity, the statute as applied deprives them of substantive due process. They further argue that in order for § 502(c) to be constitutionally applied to their claims, the Court must estimate them at an amount which will fully indemnify the Brokers if the SPDA holders prevail on all of their claims. In the alternative, they contend that the court must estimate their claims at zero and require the Debtors to waive the discharge of these claims under 11 U.S.C. § 1141(d).

Neither the Due Process Clause nor the Bankruptcy Code lends any support to these assertions. While the Brokers are indeed in the unenviable position of having to prove the SPDA holders' MDL claims in order to obtain a fair estimation of their claims, their position is no different than that of any other creditor holding a codebtor claim. What was true under § 57(i)[16] of

---

**16.** That section reads as follows:

Whenever a creditor whose claim against a bankrupt estate is secured, in whole or in part, by the individual undertaking of a person, fails to prove and file that claim, that person may do so in the creditor's name, and he shall be subrogated to the rights of the creditor, whether the claim has been filed by the creditor or by him in the creditor's name, to the extent that he discharges the undertaking except that in absence of an agreement to the contrary, he shall not be entitled to any dividend until the amount paid to the creditor on the undertaking plus the dividends paid to the creditor from the bank-

the Act is also true under §§ 502 and 509 of the Code: one who is a codebtor must establish that an amount is due and owing to a creditor as a prerequisite to allowance of his claim. *Cf. In re Miller*, 105 F.2d 926, 929 (2d Cir.1939). A codebtor may not require the debtor to underwrite the risk that the codebtor may be liable in the future. *In re Investors Funding Corp. of New York*, 8 B.R. 260, 264 (S.D.N.Y.1980). Section 502(c) was designed to give such contingent creditors an opportunity to show the amount of their potential liability, an opportunity which they might not have been afforded under § 57(d) of the Act. See *In re Cartridge Television, Inc.*, 535 F.2d 1388 (2d Cir.1976).

 Any hardship which the Brokers might suffer in requiring them to meet this burden must be weighed against the significant hardships which might befall the Debtors' other creditors if the Court adopted the Brokers' alternatives. The Brokers estimate their potential exposure in the SPDA litigation at $70 million to over $300 million before trebling, depending upon whether Planco's projections are included in the calculation. If the Court required the Debtors to allow the Brokers' proposed claims in the amount of $70 million in Class E under the Debtors' proposed plan of reorganization, the total amount of claims against the Debtors would almost certainly exceed the $440 million cap imposed by the Plan as a condition to its effectiveness. (Ex. Cl. L, Article XIV, § 14.1(d)). While this condition may be waived by a majority of the members of each creditors' committee, the Brokers have not and cannot give any assurance that the committees will waive this condition. At the very least, their proposal would require an indefinite delay in a final distribution to Class E creditors, since a calculation of the total amount of that distribution would have to await a final judgment in MDL 581. At worst, a $70 million estimate of their claims might end the fragile truce among the Debtors' other creditors, which in turn could lead to a sinking of the proposed plan and the possible conversion of this case to one under Chapter 7.

Their other alternative has an even greater potential for disaster. If the Court estimated their claims at zero and waived the discharge of those claims under § 1141(d), the Brokers would be entitled to recover the *full amount* of any contribution award they might receive in MDL 581. If that award were even a fraction of that alleged by the Brokers, the reorganized Debtors would almost certainly have to be liquidated to pay the judgment. More importantly, such a result would in effect nullify §§ 502(c) and 101(4), since the Brokers would receive the very windfall which those sections were intended to prevent.[17]

We find neither of these alternatives acceptable, and neither alternative to be mandated under the Fifth Amendment Due Process Clause. Given the legitimate legislative purposes behind § 502(c), it can hardly be asserted that the Brokers' burden in this estimation proceeding lacks a rational basis. As the Supreme Court has repeatedly emphasized in its recent pronouncements, nothing more is required to meet

rupt estate on the claim equal the amount of the entire claim of the creditor. Any excess received by the creditor shall be held by him in trust for such person.

**17.** While the waiver of the discharge and temporary disallowance of the debt was implicitly found an acceptable alternative by the Third Circuit in *Bittner v. Borne Chemical Co., Inc.*, 691 F.2d 134 (3d Cir.1982), nothing in that decision requires this result. As one commentator has noted, such a waiver clashes with the inherent purpose of § 502(c):

The approach used in *Borne* for the estimation of contingent claims together with temporary disallowance and waiver of discharge may be appropriate in rare cases. But, it reflects a return to the former Act since it may deprive the debtor of an effective rehabilitation where the contingent claims constitute a substantial portion of the overall debt structure so that a judgment subsequently obtained by the contingent claimant may require "the need for further financial reorganization." This raises the question of whether confirmation of the plan should have been denied on this ground.

B. Weintraub & A. Resnick, *Treatment of Contingent and Unliquidated Claims Under The Bankruptcy Code*, 15 U.C.C.L.J. 373, 377 (1983).

the substantive requirements of due process:

> It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way ...
>
> ... Our cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations.

*Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15–16, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976).

Even if the Brokers' alleged common law and statutory rights to contribution or indemnity are viewed as property rights, and § 502(c) were viewed as eradicating those rights, it is axiomatic that:

> a legislature generally has the power to impose new regulatory constraints on the way in which those rights are used, or to condition their continued retention on performance of certain affirmative duties.

*U.S. v. Locke*, —— U.S. ——, ——, 105 S.Ct. 1785, 1797, 85 L.Ed.2d 64, 82 (1985); *accord, National Railroad Passenger Corp. v. Atchison, Topeka and Santa Fe Railway Co.*, 470 U.S. ——, ——, 105 S.Ct. 1441, 1455, 84 L.Ed.2d 432, 450 (1985); *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, ——, 104 S.Ct. 2709, 2717, 81 L.Ed.2d 601, 610–611 (1984); *see also, Harris Corp. v. Comair, Inc.*, 712 F.2d 1069, 1073–1074 (6th Cir.1983) (workmen's compensation statute which bars indemnity claims against third-party tortfeasors did not violate employer's substantive due process rights); *In re Cartridge Television, Inc., supra* at 1391–1392.

For the reasons stated above, we are constrained to override the Brokers' due process arguments as well as their other objections to the estimation hearings.

## B. INDEMNIFICATION IS NOT AVAILABLE TO THE BROKERS.

■■■ Throughout this proceeding the Brokers have emphatically argued that they are entitled to indemnification[18] from the Debtors for some or all of any damages they are required to pay in MDL 581. They do not and cannot seriously contend that they would be entitled to this remedy in the event that they are found to have violated § 10(b) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b–5, which require a showing of scienter as a prerequisite to liability (*Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)), since the case law leaves no doubt that indemnification is not available for knowing violations of the securities laws. *See, e.g., Globus v. Law Research Service, Inc.*, 418 F.2d 1276, 1288–89 (2d Cir.1969), *cert. denied* 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970) ("Globus I"); *In re New York City Municipal Securities Litigation*, 87 F.R.D. 572, 577 (S.D.N.Y.1980).

However, not all of the securities laws which the Brokers allegedly violated require a showing of scienter as a prerequisite to recovery. Specifically, §§ 11, 12(1), and 12(2) of the Securities Act of 1933 ("1933 Act") merely require a showing of negligence in order to recover. Based upon vague language in the *Globus I* opinion, the Brokers insist that they are entitled to indemnification from the Debtors if they are found liable under the negligence standard of the statutes cited above.

We believe that the thin thread of support for this argument found in *Globus I* cannot withstand the weight of authority to the contrary. Indeed, the very court in which the MDL litigation is pending has

---

**18.** "Indemnification" is defined as "the shifting of the entire cost of tortious conduct to another 'party.'" *Stratton Group, Ltd. v. Sprayregen*, 466 F.Supp. 1180, 1185 n. 4 (S.D.N.Y.1979). This concept must not be confused with the equitable doctrine of contribution, which "provides that one of two or more *joint wrongdoers* should not be required to pay more than his share of a common burden, or, stated differently, that no obligor should be unjustly benefitted at the expense of another." *Id.* at 1185 n. 4.

addressed this argument and rejected it. In *Odette v. Shearson, Hammill & Co., Inc.*, 394 F.Supp. 946, 956 (S.D.N.Y.1975), the court denied indemnification for possible liability under § 12(2) even upon a showing of "mere negligence." The court acknowledged that *Globus I* confined its holding to conduct involving "more than ordinary negligence," (418 F.2d at 1288), but concluded that:

> [T]he court's statement of the public policy objections to indemnification of liabilities under the 1933 Act is broad enough to cover *negligent* misconduct in violation of § 12(2).

394 F.Supp. at 956.

Many other courts have reached the same conclusion under the provisions of the securities laws imposing a negligence standard of care. *Laventhol, Krekstein, Horwath & Horwath v. Horwitch*, 637 F.2d 672, 676 (9th Cir.1980) *cert. denied*, 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 975 (1981) (cross claim for indemnity for violation of § 11 of the 1933 Act was properly dismissed by district court); *Sherlee Land v. Commonwealth United Corp.*, CCH Fed.Sec.L.Rep. ¶ 93,749 (S.D.N.Y.1973); *Gould v. American Hawaiian Steamship Co.*, 387 F.Supp. 163 (D.Del.1974) (indemnification for a violation of Rule 14a–9 which imposes a negligence standard would be contrary to the deterrent policy of the securities laws). *See also, In re Equity Funding Corp.*, 416 F.Supp 132, 156 (C.D.Cal.1975) (the policy of the securities laws precludes indemnification even where liability is based upon negligence.)

Based upon the above, we find it more probable than not that the Brokers' claims for indemnification will be dismissed by the District Court in MDL 581.

### C. THE BROKERS WILL PREVAIL IN MDL–581.

While the foregoing effectively disposes of all of the Brokers' claims as a matter of law, our review of the facts adduced at the estimation hearing as well as applicable law indicates that the Brokers will probably obtain a defense verdict in MDL 581. Thus, even if the doctrine of contribution were available to them in their third-party claims against the Debtors, (*See, e.g., Heizer Corp. v. Ross*, 601 F.2d 330, 334 (7th Cir.1979)) a reasonable estimate of their bankruptcy claims must be zero.[19]

The complaints consolidated in MDL 581 assert a variety of federal claims as well as pendent state common law and statutory claims. The federal claims, for the most part, center on the allegation that the SPDAs are "securities" subject to the registration requirements of the 1933 Act and subject to the disclosure obligations of both the 1933 Act and the 1934 Act including Rule 10b–5 promulgated thereunder. There are also claims under the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, and pendent claims for common law fraud and violation of state consumer protection statutes. Brokers seek contribution (and indemnity) from the Debtors with respect to any liability that they might have in MDL 581 or in any other actions involving their sale of SPDAs.

In our view, the SPDA plaintiffs' chances of prevailing on any of these alternative theories of liability are poor.

### i. THE SPDAS ARE EXEMPT FROM THE SECURITIES LAWS.

In order to prove any liability under the 1933 or 1934 Acts, plaintiffs must establish as a threshhold matter that the SPDAs sold constitute "securities" as defined therein.[20] In his opinion approving the MDL settlement, Judge Brieant characterized the contention that the SPDAs are securities as an allegation concerning a

---

19. We note in passing that the Brokers do not argue with the Debtors' legal or factual conclusions regarding the probable outcome of MDL 581. Thus, our estimation is based upon undisputed facts and law.

20. The definitions of a "security" under the 1933 and 1934 Acts are essentially the same and must be read in *pari materia*. *Commercial Discount Corp. v. Lincoln First Commercial Corp.*, 445 F.Supp. 1263, 1265-6 (S.D.N.Y.1978) (Brieant, J.)

mixed issue of fact and law, Brieant Opinion at 1316, stating:

> Before plaintiffs can even advance proof that defendants' conduct was misleading under the federal securities statutes, *plaintiffs bear a burden* of establishing that the SPDAs are subject to federal securities regulation. A finding that the SPDAs are not "securities" would compel dismissal of Counts I, II and III of the complaints, as well as the dismissal of comparable state blue sky claims and the federal RICO count which is predicated upon alleged securities law violations. The issue is one of first impression subject to appellate review, although perhaps not until entry of a final judgment if decided favorably to plaintiffs. Furthermore, even if the Court were to find that the SPDAs are securities, defendants contend that they were exempt from registration under Sections 3 and 4 of the 1933 Act.

Brieant Opinion at 1322–3. (emphasis added).

The term security is broadly defined in 15 U.S.C. § 77b(1) (the 1933 Act) and 15 U.S.C. § 78c(a)(10) (the 1934 Act), and includes any "investment contract." This term has been recognized as a "catch-all to bring within the securities acts interests that have the functional attributes of stock and other formal securities but are not so denominated." *Peoria Union Stock Yards Co. Retirement Plan v. Penn Mutual Life Insurance Co.*, 698 F.2d 320, 324 (7th Cir. 1983).

By contrast, 15 U.S.C. § 77c(a)(8) provides an "exemption" from the classes of securities covered for:

> Any insurance or endowment policy or annuity contract or optional annuity contract, issued by a corporation subject to the supervision of the insurance commissioner, bank commissioner, or any agency or officer performing like functions, of any State or Territory of the United States or the District of Columbia."

These provisions must be harmonized with the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–12, which codifies Congressional intent to leave the regulation of the "business of insurance" to the states.

The factors for determining whether annuity contracts are investment contracts subject to the securities laws are set forth in two U.S. Supreme Court decisions. In *Securities and Exchange Commission v. Variable Annuity Life Insurance Co.*, 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959) ("VALIC") and in *Securities and Exchange Commission v. United Benefit Life Insurance Co.*, 387 U.S. 202, 87 S.Ct. 1557, 18 L.Ed.2d 673 (1967) the Court held that annuities with certain "variability features" were securities subject to the 1933 Act. In both cases, the annuity contracts provided for payments to the annuitant in varying amounts, depending upon the success of the annuity company's investment policy. In VALIC the Court ruled that in order for annuity contracts to be exempt from the securities laws, the issuing company (i) must take some investment risk; and (ii) must guarantee that at least some fraction of the benefits will be paid to the annuitant in fixed amounts. The VALIC annuities "guarantee[d] nothing to the annuitant except an interest in a portfolio of common stocks or other equities—an interest that has a ceiling but no floor." 359 U.S. at 72, 79 S.Ct. at 622. In *United Benefit* the variability problem was alleviated somewhat by the insurance companies' guarantee of a certain minimum payment upon maturity. The Court found however, that this degree of assumption of investment risk was insufficient to meet the insurance exemption, because the guaranteed return was substantially less than that of a conventional deferred annuity contract. The Court set forth the test as "what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect." 387 U.S. at 211, 87 S.Ct. at 1562.[21]

---

21. *See also, Peoria Union Stock Yards Co. Retirement Plan v. Penn Mutual Life Ins. Co.*, 698 F.2d 320, 322 (7th Cir.1983) ("annuity contract" guaranteeing interest on contributions for the first

In sum, the caselaw holds that in order for an annuity contract to be exempt under the securities laws, the insurance company must bear a significant investment risk and a meaningful mortality risk.

We find it reasonably probable that the annuity contracts here in question will meet these criteria. They were fixed annuity contracts issued out of and supported by the general accounts of the Debtors' insurance subsidiaries. (Debtors' Ex. 159 at 3). The policyholder paid an initial lump sum to the Debtors' insurance subsidiaries in exchange for the promise of the insurance subsidiaries to repay the initial investment together with accumulated interest. Interest would accrue from the date of issue until such time in the future as the SPDA policyholder might request either a lump sum payment or a series of payments for life. Brieant Opinion at 1314. (Debtors' Exs. 83, 84). The SPDAs guaranteed interest at a contract "market" rate for the first year. A 7.5 percent interest rate was typically guaranteed for years two through nine, and 4 percent interest thereafter.[22] (Debtors' Exs. 83, 84.) In fact, the guarantee of such a high interest rate to SPDA purchasers when compared with the low yield being obtained from Debtors' affiliate investments was cited as one contributing cause of Debtors' financial downfall in the Court-appointed Examiner's Statement of Investigation. (Consolidated Case No. 1-83-02495, Doc. No. 1453 at 36).

This "significant investment risk" was coupled with a demonstrable mortality risk. If the SPDA policyholder chose to annuitize his account, he received a fixed monthly payment. Since the annuity purchase rates were specified in the contract when it was issued, the insurance subsidiaries bore the risk that annuitants as a group would live longer than anticipated when the contracts were issued and the rates were established. (Debtors' Exs. 83, 84.)

The major selling points of these SPDAs provide further evidence that they were true annuities subject to exemption. They appealed to purchasers contemplating retirement, and to conservative family-oriented persons. (Debtors' Ex. 60). The Brokers marketed them on the basis of conservatism, stability and security. (Debtors' Exs. 157, 158 and 159). The average age of an SPDA policyholder was 55, with almost half of the policyholders over 60 years old and only 21 percent under 50 years old. (Debtors' Ex. 160).

The profile of these SPDAs is almost identical to those annuity contracts found to be exempt in *Otto v. Variable Annuity Life Insurance Co.*, 611 F.Supp. 83 (N.D. Ill.1985). The annuities in that case provided retirement stability, with the insurance company bearing the investment risk by guaranteeing the return of both principal and a minimum of 4% compound annual interest for the first ten years of participation and 3½% interest thereafter. 611 F.Supp. at 86.

Based upon the facts presented and applicable law, it is reasonably probable that the SPDAs will be deemed exempt from the securities laws. It follows from this conclusion that all of the SPDA policyholders' federal securities law claims will fail, and that comparable state blue sky claims and the federal RICO count predicated upon alleged securities laws violations will also be dismissed. *See* Brieant Opinion at 1322-3.

**ii. THE BROKERS WILL PREVAIL ON THE SPDA HOLDERS' OTHER FEDERAL AND STATE LAW ALLEGATIONS.**

Even if the MDL 581 plaintiffs somehow demonstrate that the SPDAs are "securities" for purposes of the 1933 and 1934 Acts, it is reasonably probable that they will be unable to meet their burden of proof under the remedial provisions of the

---

**22.** Debtors' Ex. 44, Tables 1 and 6 portray the asset portfolios of the insurance subsidiaries. However, the return on investment guaranteed to SPDA purchasers was not tied to the performance of such assets.

three years only, with investment income credited as earned thereafter constituted an investment contract); Annotation, 18 L.Ed.2d 1557.

securities laws set forth in their complaints.

To prevail on claims under Rule 10b–5 and common law fraud, the SPDA policyholders must prove that Brokers made false material representations or omitted to disclose material information, while acting with scienter. *See, Rolf v. Blyth, Eastman Dillon and Co.*, 570 F.2d 38, 44 (2d Cir.1978) *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978). The scienter element of Rule 10b–5 is satisfied by proof that a defendant acted recklessly. The Second Circuit defined reckless conduct as "at the least, conduct which is 'highly unreasonable'" and which represents "an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* at 47. Plaintiffs' counsel in MDL 581 "has recognized that plaintiffs bear a risk of establishing that defendants [Brokers] knew that their representations were materially false and misleading or that they acted with reckless disregard as to whether they were true." Brieant Opinion at 1322. *See,* Debtors' Ex. 20 at 19.

Scienter must also be proved to establish common law fraud.[23] *Rolf, supra* at 45, 47.

Unlike Rule 10b–5, liability under § 12(2) of the 1933 Act[24] is established by showing a failure to exercise reasonable care. However, the "seller is exculpated if he proves that he did not know, or in the exercise of reasonable care, could not have known of the untruth or omission." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 209 n. 27, 96 S.Ct. 1375, 1388 n. 27, 47 L.Ed.2d 668 (1976).

We find it unlikely that the SPDA plaintiffs will succeed in establishing that the Brokers acted negligently, let alone with scienter, in connection with the sale of these annuities. First, we conclude that the Brokers reasonably relied on the extensive regulation of the insurance subsidiaries by state insurance authorities. As Judge Brieant noted:

> [T]he broker-dealers had a right to rely upon official state regulators who were obligated to safeguard solvency of the insurance companies and who uttered comforting bromides almost to the end.

Brieant Opinion at 1324 [25]

The evidence presented amply supports this conclusion. There is no question that the insurance subsidiaries were duly licensed by the appropriate state officials to sell insurance in all states in which the SPDA policies were being sold, including Arkansas and Indiana. *See, e.g.*, Debtors' Exs. 57 at 13; 20 at 16–18; 58; 56 at 24.

In discharging their watchdog responsibilities, the Insurance Commissioners and their staffs conducted extensive on-site audits. In particular, the Arkansas Insurance Department actively regulated the Arkansas-domiciled insurance subsidiaries. On various occasions, the Department dis-

---

**23.** As Judge Brieant noted, to establish common law fraud, proof of scienter

> presents at least the same problem existing in proof of a Rule 10b–5 violation, except that the concepts of a misleading omission or a reckless, but non-fraudulent disregard on the part of the person making the misrepresentation are not nearly so well developed in the context of pendent state law fraud as they are in the jurisprudence arising under the federal securities laws.

Brieant Opinion at 1323.
Indeed, our research indicates that the burden of establishing common law fraud may be greater than the burden of proof under Rule 10b–5, since fraud normally requires a showing of clear and convincing evidence rather than a mere preponderance of the evidence. *See, e.g.*

*Pierce v. Richard Ellis & Co.*, 62 Misc.2d 721, 310 N.Y.S.2d 266, 269 (1970) and cases cited therein.

**24.** This provision makes it unlawful, in connection with the offer or sale of a security for a person to make a misrepresentation or omission of material fact unknown to the purchaser.

**25.** *See also, Cotten v. Republic National Bank of Dallas*, 395 S.W.2d 930, 945 (Tex.Civ.App.1965):

> [T]he Bank was entitled to believe, in the absence of evidence to the contrary, that the Board of Insurance Commissioners had made the necessary examination of [the insurance company] and had been satisfied by its annual statements that it was solvent.

approved proposed transactions, required Baldwin-United or D.H. Baldwin to pay in additional capital and took other regulatory measures. *See,* Debtors' Exs. 56; 57; 73; 101, 104, 107, 140. The Indiana Insurance Department also examined the Indiana-domiciled Insurance Companies during the period in which the SPDAs were sold. (Debtors' Exs. 58 at 13–15; 62).

On numerous occasions state regulators repeatedly made reassuring public statements regarding the soundness of these insurance subsidiaries. For example, on December 31, 1982 the Arkansas Insurance Commissioner sent a report to the insurance commissioners of every other state stating unequivocally that pursuant to his examination, National Investors Life Insurance Co. ("NILIC") and National Investors Pension Insurance Co. ("NIPIC") were determined to have a combined surplus of $114 million. (Debtors' Ex. 56 at 1).

On April 11 and 12, 1983, officials of the Arkansas and Indiana Insurance Departments spoke with an attorney hired by Kidder, Peabody & Company. They stated that the insurance companies were in good standing with their departments and that they had not taken any action to limit their authority to sell SPDAs or any other products which they were licensed to sell. *See,* Debtors' Ex. 58 at 5–6, 14. The Indiana official said that on the basis of an ongoing regular triennial examination the Indiana Department could forsee no problems with these companies. *Id.* The Arkansas official stated that neither NILIC nor NIPIC was in danger of insolvency because their obligations were backed by "good assets." *Id.* at 6. He also said that both companies were fully solvent and that persons holding obligations of either need not be concerned with the safety of the SPDAs. *Id.* Officials of other state insurance departments made similar statements. *Id.* at 7–8. *See also,* Debtors' Ex. 61.

In late April, 1983, only two months before rehabilitation proceedings were commenced, the Indiana Insurance Commissioner was quoted in a *Wall Street Journal* article as saying "we haven't discovered any problem" with the insurance companies. (Debtors' Ex. 119.) On April 29, 1983, an official of the Indiana Insurance Department reported that University Life Insurance Co. of America ("ULIC") was still in good standing with the Indiana Department and that the ongoing examination of ULIC had not yet uncovered any problems that concerned the Department. (Debtors' Ex. 58 at 14–15).

According to the affidavit of David Bershad, liaison Counsel for the MDL plaintiffs, as late as June 29, 1983, the senior examiner of the Arkansas Insurance Department stated that the Arkansas insurance companies "had adequate assets to meet all obligations." *See,* Debtors' Ex. 19 at 13, quoting memorandum prepared by broker-dealer Smith Barney.

Putting aside the Brokers' reasonable reliance on the state regulators, many Brokers, including the claimants in this proceeding, made independent efforts to determine the safety of the SPDAs.

Throughout the relevant period, the insurance companies received ratings of "A (Excellent)" from A.M. Best Insurance Service, the "leading insurance company rating agency." Brieant Opinion at 1315. (Debtors' Exs. 55; 129 at 2; 130 at 2; 132 at 2; 134 at 2.) Paine Webber directly consulted with Best personnel in late 1982. Best advised Paine Webber that it could see no reason for concern about the insurance companies and stressed that NILIC retained its "A (Excellent)" rating. (Debtors' Ex. 55.)

As early as 1981, Milliman & Robertson was retained by Paine Webber, Shearson and other broker-dealers periodically to report on the insurance companies and SPDAs. Noting that the companies were under close watch from the state regulators, they repeatedly advised the broker-dealers that the SPDAs were safe and could continue to be marketed with appropriate monitoring. (Debtors' Exs. 53, 33, 28, 46, 48). In January, 1983, Milliman & Robertson reported that "the insurance subsidiaries were in a satisfactory position with respect to covering SPDA surrender

values and were statutorily solvent at 9/30/82." (Debtors' Exs. 51 at 2, 4–5; 45 at 21, 26–27). Its April 15, 1983 report to Paine Webber, Shearson and other broker-dealers concerning the insurance companies concluded, with few qualifications, that "the financial condition of the NI SPDA operations does not suggest the need for the SPDA contract holders to move out of those contracts." (Debtors' Exs. 28 at 24; 46 at 24) Milliman further advised its clients that "the financial position of the [insurance companies] does not suggest that an SPDA contract holder who goes into that company is in financial jeopardy." (Debtors' Exs. 28 at 26; 46 at 26; Ex. 48).

As noted above, in the spring of 1983 Kidder, Peabody & Company hired a law firm (Hill & Barlow of Boston, Massachusetts) to determine whether any regulatory action had been taken to limit the authority of the insurance subsidiaries to sell SPDAs or any other type of insurance which either was licensed to sell. Hill & Barlow reported that none of the 12 insurance departments it had contacted, including Arkansas' and Indiana's, had acted to limit the authority of the insurance companies to sell SPDAs or any other type of insurance which either was licensed to sell in those states, and that the insurance regulators indicated there was no cause for concern regarding the financial soundness of the insurance subsidiaries. *See,* Debtors' Ex. 58; *see also,* Exs. 119; 135 at 2.

This evidence does not portray a picture of brokers throwing caution to the winds or mindlessly selling a product despite facts which would require a reasonable man to inquire further. While the SPDA plaintiffs will undoubtedly attempt to cast these documents in a different light, the Brokers' diligent (and undoubtedly costly) investigations into the quality and safety of these annuities, as well as their justified reliance upon the state regulators, will make it extremely difficult for the plaintiffs to recover under the negligence standard imposed

by § 12(2) or the scienter standard of § 10b–5.[26] The same would hold true as to their common law negligence, fraud, and breach of contract causes of action. *See also,* Brieant Opinion at 1322.

■ Plaintiffs probably will fare no better as to their claims under § 5 and 12(1) of the 1933 Act. The combined effect of these sections is to impose "strict liability on offerors and sellers of unregistered securities." *Swenson v. Engelstad,* 626 F.2d 421, 424 (5th Cir.1980). Section 13 (15 U.S.C. § 77m) requires actions under § 12(1) to be brought within one year after the violation upon which it is based, and no more than three years after the securities were bona fide offered to the public. Putting aside the question of whether these annuities are exempt from the securities laws, the policyholders' § 12(1) claims may well be time-barred since the SPDAs were first licensed and approved for sale in 1979, and the SPDA policyholders did not commence their actions until September of 1983.

The same holds true for the MDL plaintiffs' claims under § 12(2), since § 13 requires that such claims be brought within one year after the discovery of the untrue statement or omission (or after such discovery should have been made by the exercise of reasonable diligence), and not more than three years after the sale of the security. *See, Herm v. Stafford,* 663 F.2d 669 (6th Cir.1981); *Braka v. Multibanco Comermex, S.A.,* 589 F.Supp. 802 (S.D.N.Y. 1984).

■ The MDL plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68 will probably prove to be equally unavailing. The RICO statute makes it unlawful for any person to use a "pattern of racketeering activity" or to use any income derived from a "pattern of racketeering activity" to conduct the affairs of an

---

**26.** Apparently the officers and employees of the Brokers were convinced that the annuities were

a safe investment, since certain of them purchased these SPDAs. (Debtors' Ex. 20 at 17–18).

"enterprise." [27] If the plaintiffs establish the occurrence of two acts of "racketeering activity" as defined in § 1961(1) within the last ten years, and thus make out the requisite pattern, they would be entitled to recover treble damages. 18 U.S.C. § 1964(c).

The predicate acts of "racketeering activity" alleged in MDL 581 are fraud in the sale of securities (§ 1961(1)(D)), mail fraud, and wire fraud (§ 1961(1)(B)). While the Supreme Court has recently made it clear that proof of these predicate acts does not require proof of a prior criminal conviction or of "mobster" activity (*Sedima, S.P.R.L. v. Imrex Co.,* —— U.S. ——, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)), we find it unlikely that the Brokers will be found liable under the statute. The predicate acts upon which plaintiffs' RICO allegations rest require proof of fraud, a burden which, as discussed above, they probably will be unable to sustain. Since the MDL plaintiffs are unlikely to succeed in establishing those predicate acts, they are equally unlikely to succeed on their RICO claims.[28] Brieant Opinion at 1322.

Even if the plaintiffs do prevail on their RICO claims, we find it improbable that the Brokers could prevail against the Debtors on their contribution claims.

In *Boone v. Beacon Building Corp.,* 613 F.Supp. 1151 (D.N.J.1985), the court notes the similarities between the antitrust laws and RICO, in particular § 4 of the Clayton Act for which the U.S. Supreme Court declined to recognize a right to contribution in *Texas Industries v. Radcliff Materials,* 451 U.S. 630, 639, 101 S.Ct. 2061, 2066, 68 L.Ed.2d 500 (1981).

Accordingly, we find it reasonably probable that the Brokers will prevail on their RICO claims, thus erasing their contribution claims against the Debtors on this theory.

Finally, the Brokers claim entitlement to contribution for any judgment awarded against them under state consumer protection statutes. Here again the Brokers' right to rely on the state regulators, as well as their own due diligence, pose strong defenses for the plaintiffs to overcome. While most of these statutes require a showing of unfair or deceptive conduct as a prerequisite to recovery (Brieant Opinion at 1324), it is unclear whether they apply to sales of SPDAs, whether they require proof of scienter, and whether statutes of limitations or other conditions precedent to commencement of such actions have been met.[29] (Brieant Opinion at 1323–25); (Debtors Exs. 8 at 30–33; 19 at 23–28).

As Judge Brieant noted, "[e]xperience already has shown that litigation under such state statutes is far from a sure thing." Brieant Opinion at 1324. The only SPDA-related case in which a judgment has been rendered certainly buttresses Judge Brieant's view. In *Carter v. Parham and J.C. Bradford & Co.,* Civil Action No. 83–52–21881 (Sullivan Co. Tenn.), the jury returned a defendants' verdict on all counts, including violation of a state statute concerning annuity sales. Brieant Opinion at 1324.

Thus, a realistic assessment indicates that the Brokers are likely to prevail on the

---

**27.** An "enterprise" includes any individual, partnership, corporation, association or other legal entity or any union or group of individuals associated in fact, although not a legal entity. 18 U.S.C. § 1961(4). *See, United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981).

**28.** We note in passing that the Supreme Court in its *Sedima* opinion specifically declined to rule on the appropriate burden of proof for establishing predicate acts. —— U.S. at ——, 105 S.Ct. at 3283, 87 L.Ed. at 356. At least one Court has indicated, however, that the criminal statutes upon which predicate acts are based should be

"strictly construed," and thus might require proof greater than a mere preponderance of the evidence. *Flowers v. Continental Grain Co.,* 775 F.2d 1051, 1054 (8th Cir.1985).

**29.** Given the unsettled nature of these statutes, it is entirely possible that the District Court might exercise its discretion under the principles of pendent jurisdiction to dismiss these claims. Indeed, if all of plaintiffs' federal causes of action are dismissed prior to trial, dismissal of *all* of plaintiffs' state law claims may be mandatory. *McLearn v. Cowen & Co.,* 660 F.2d 845, 848 (2d Cir.1981).

plaintiffs' claims under state consumer protection laws.

## IV. EQUITY REQUIRES THE DISALLOWANCE OF THE BROKERS' CLAIMS.

 Even if the Brokers were correct in their estimate of the potential liability they face in MDL 581 and other actions, and even if their contribution claims were otherwise allowable as a matter of law, fundamental principles of equity and fairness mandate disallowance.

Our reasons for so holding spring from the grim realities which Baldwin's collapse has left in its wake. While the misfortunes of the SPDA policyholders is hardly trivial, their plight pales in comparison with that of the other innocent investors who purchased Baldwin securities. On nearly a daily basis this Court receives correspondence from people who purchased Baldwin bonds, debentures, and stock who have suffered economic ruin as a result of this business failure. Many of them are advanced in years; some apparently invested most or all of their life savings in Baldwin securities. After a two year hiatus in payment of dividends or interest on their holdings, some of these people are now poverty-stricken.

Under the best of circumstances, the SPDA holders will be made whole, or nearly so, when the Enhancement Plan is effectuated. The other Baldwin investors cannot look forward to such a happy ending. At present, their only hope of recovery rests in the Debtors' plan of reorganization. Those with creditor status might receive as much as 45 cents on each dollar; the equityholders will receive a small fraction of that amount in newly-issued stock.

We have no clear factual basis to dispute the Brokers' assertions that they have and will continue to suffer economic harm from the demise of the Baldwin empire, and that they are no less innocent victims than the investing public. In pursuing their contri-

bution claims, however, they seek to pass on any losses they may sustain at the hands of innocent SPDA purchasers to equally innocent investors in Baldwin securities. These same investors undoubtedly purchased their securities through many of the same brokerage firms which now threaten to diminish or destroy their recovery from the Debtors.

No precedent exists for such a perversion of equity or of the doctrine of contribution, which has its roots in equity. Indeed, the courts historically have excluded insolvent[30] parties in fashioning contribution decrees. This equitable concern pervades the decision reached in *Pension Benefit Guaranty Corp. v. Ouimet Corp.*, 711 F.2d 1085 (1st Cir.1983), *cert. denied*, 464 U.S. 961, 104 S.Ct. 393, 78 L.Ed.2d 337 (1983). In holding that a bankrupt corporation should be excluded from the allocation of liability for an underfunded pension plan, the Court stated:

> The allocation to be made in this case is really one between the solvent members of the Ouimet Group and the creditors of the bankrupt companies, Avon and Tenn-ERO. The creditors' claims significantly exceed the assets available in the bankruptcy estates and to the extent that assets from these estates are used to satisfy PBGC's claim there will be an even smaller amount available to creditors ... [W]e do not think that the statutory provisions treating commonly controlled businesses as one employer should operate—by using the entire Group's net worth in computing the thirty percent ceiling—to increase the liability amount and then allow the Group to pass as much of this increase as possible along to creditors of the bankrupts.

711 F.2d at 1091.

*See also, Gideon v. Johns-Manville Sales Corp.*, 761 F.2d 1129, 1140 (5th Cir.1985); *Moody v. Kirkpatrick*, 234 F.Supp. 537, 542 (M.D.Tenn.1964).

(Debtors' Amended Disclosure Statement.)

---

**30.** "As of December 31, 1983, B–U had a negative net worth of nearly $1 billion." Cl Ex.L.

The injustice of the Brokers' position is amplified by the fact that the Debtors are already committed to paying over $170 million to the insurance rehabilitators under their "Global Settlement." Despite the Brokers' characterization of this settlement as merely an "exchange of cash for securities" (Claimant's Pre-Trial Brief, Doc. 21–36 at 25), it is clear from the record and the history of these cases that the Debtors' payment of this settlement amount is for the benefit of the policyholders, and can be fairly characterized in no other way.

The fact that the payment will arrive in the policyholder's pockets through the Rehabilitators' participation in the Enhancement Plan, and not as a direct payment from the Debtors, in no way lessens its effect as a contribution payment, since it will concommitantly lessen the amount of the Brokers' potential liability to the SPDA holders. *See, MacKethan v. Burrus, Cootes and Burrus*, 545 F.2d 1388, 1390–1 (4th Cir.1976); *cert. denied* 434 U.S. 826, 98 S.Ct. 103, 54 L.Ed.2d 85 (1977) *Stratton Group, Ltd. v. Sprayregen*, 466 F.Supp. 1180 (S.D.N.Y.1979); *Restatement (Second) Torts* § 885(3) and comments (e) and (f) thereto. While the payment which the Debtors make may not measure up to the proportion of contribution which the Brokers say is due, it is far more than either law or equity requires. *In Re Investors Funding Corp. of New York*, 8 B.R. 260 (S.D.N.Y.1980); *In re Equity Funding Corp. of America*, 416 F.Supp. 132, 156 (C.D.Cal.1975).

## V. CONCLUSION

For the reasons outlined in detail above, the Brokers' claims are hereby **DISALLOWED** in their entirety. The foregoing shall constitute this Courts findings of fact, opinion and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure and Bankruptcy Rule 7052.[31]

IT IS SO ORDERED.

## EXHIBIT A

Contested Docket No. 21

Contested Docket No. 22

## ORDER RE: ESTIMATION OF CLAIMS THROUGH SUMMARY TRIAL

At Cincinnati, in said District, on October 16, 1985:

Pursuant to Rule 16 of the Federal Rules of Civil Procedure, as incorporated by Bankruptcy Rule 7016, and 11 U.S.C. § 502(c), the Court hereby ORDERS that the following procedures shall apply for the estimation of claims in the above-captioned contested matters:

1. The above-captioned actions are hereby consolidated for purposes of a summary trial to be conducted on December 3 and 4, 1985. Each of the claimants/defendants shall have 2 hours to present its case to the Court. The debtor/plaintiff shall have 5 hours to present its case to the Court.

2. The attorney presentations shall be organized in the manner of a typical trial. First, plaintiff may present an opening statement not to exceed 20 minutes. Each defendant may then present an opening statement not to exceed 10 minutes per defendant. Plaintiff and defendants shall then present their case-in-chief, which shall consist of a statement by counsel of who the witnesses are, what their testimony would be and what documentary or discovery evidence would establish. In addition, the plaintiff and each defendant may present live testimony by one witness each. Cross examination of such witnesses by opposing parties shall be limited to 30 minutes per opposing party. Finally, plaintiff

---

31. Shearson and Robinson Humphrey filed a response to the Debtors' objections which purports to set forth three counterclaims seeking declaratory relief pursuant to 28 U.S.C. § 2201. We view these counterclaims as being more in the nature of affirmative defenses. To the extent that they set forth separate causes of action, we conclude that all of the issues which they raise have been addressed and disposed of above, and accordingly they are hereby dismissed. *See, In re Baldwin-United Corp.*, 48 B.R. 49, 56–57 (Bankr.S.D.Ohio 1985), and cases cited therein.

and defendants may present closing arguments to the Court. The parties are free to divide their allotted time among the three trial segments as they see fit, but in no event shall the total time allotted to each party exceed that set forth in paragraph 1 above.

3. With the exception of live testimony by one witness per party, all evidence shall be presented by the attorneys for the parties. The attorneys may summarize and comment on the evidence and may summarize or quote directly from depositions, interrogatories, requests for admissions, documentary evidence, and sworn statements of potential witnesses. However, no witnesses' testimony may be referred to unless the reference is based upon one of the products of the various discovery procedures or upon a written sworn statement of the witness. Objections will be received if in the course of a presentation counsel goes beyond the limits of propriety in presenting statements as to evidence or argument thereon. All evidence presented or described by counsel shall be admissible if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence, except that counsel may not introduce evidence if its probative value is substantially outweighed by the danger of undue prejudice or confusion of the issues.

4. By no later than November 12, 1985, counsel shall submit to the Court a statement of the contested issues of fact and law to be determined at the summary trial, and a list of exhibits which each party intends to introduce at the trial. The issues of law should be accompanied by citations of authority which support the parties' respective positions. Plaintiff shall number its exhibits in ARABIC numbers, while defendants exhibits shall be organized by LETTERS as follows: Paine, Webber—PW A, B, etc.; Shearson—Sh A, B, etc.; Edward D. Jones—EDJ A, B, etc.; Robinson, Humphrey, et al.—RH A, B, etc.; W.H. Newbold—WHN A, B, etc.. Joint exhibits shall be marked in ROMAN NU-MERALS. The parties shall exchange copies of their exhibits, and shall provide the Court with two copies of each set, by November 12. By October 31, 1985 counsel for each party shall disclose the identity of the witness, if any, which they intend to call at trial. The person identified shall be made available at trial regardless of whether he or she is called to testify by the offering party. No motion relating to discovery, such as a motion to compel or a motion for a protective order, shall be filed after November 8, 1985. A pretrial conference shall be held on November 13, 1985 at 10:00 a.m.

5. The parties as well as their counsel must be present during the summary trial. Each party must be represented at trial by an individual with full settlement authority and a thorough knowledge of the case. This individual must be present throughout the summary trial. This requirement can be waived only by order of the Court and upon a showing of extraordinary circumstances.

6. Unless all parties agree otherwise, the summary trial will be recorded.

7. By no later than December 2, 1985 counsel shall present the Court with proposed findings of fact and conclusions of law regarding the estimation of defendant's claims.

IT IS SO ORDERED.

s/Randall J. Newsome
Randall J. Newsome
Bankruptcy Judge